**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

**BRIAN D. STEAVENS**, *et al.*,

      Plaintiffs,

vs.

**ELECTRONIC DATA SYSTEMS
CORP.**,

      Defendant.

CASE NO. 1:08-cv-10409-RJH

---

<u>**MEMORANDUM IN SUPPORT OF DEFENDANT ELECTRONIC DATA SYSTEMS
CORPORATION'S MOTION TO DENY CLASS CERTIFICATION OF
CALIFORNIA STATE LAW CLAIM**</u>

April 7, 2010

BAKER & HOSTETLER LLP

Martin T. Wymer
Todd A. Dawson
Gregory V. Mersol
3200 National City Center
1900 East Ninth Street
Cleveland, OH  44114-3485
(216) 621-0200

*Attorneys for Defendant
Electronic Data Systems Corporation*

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ............................................................................................... 1

II.    STATEMENT OF FACTS ................................................................................... 2

    A.    Background ................................................................................................. 2

    B.    EDS' California Operations ...................................................................... 2

        1.    The City of Anaheim Account .................................................... 2

        2.    U. S. Defense Manpower Data Center – Seaside, California ......................... 3

        3.    EDS' California Department of Social Services and California Medi-Cal Accounts ............................................................ 4

        4.    Virtual Support of California Customers ................................... 5

        5.    Computer Systems Analysis For California Customers .................... 5

    C.    Plaintiff Rod Deluhery's Employment With EDS ................................... 6

    D.    The Only Other California Employee to File a Consent Form Performs Entirely Different Job Functions Than Deluhery ....................... 9

III.    DELUHERY'S CLASS CLAIMS SHOULD BE DISMISSED ........................... 10

    A.    Deluhery's Proposed Class Fails Under Rule 23(b)(3) ................................ 11

        1.    Common Questions Would Not Predominate ................................. 12

        2.    A Class Action Is Not Superior To Other Forms Of Adjudication ............. 16

    B.    Deluhery's Proposed Class Also Fails Under Rule 23(a) ....................... 18

        1.    Deluhery Is Not A Proper Class Representative Under Rule 23(a) ............. 18

        2.    The Proposed Class Fails For Lack Of Commonality And Typicality ......... 21

    C.    Deluhery's Proposed Class Definition Is Facially Impermissible.............. 23

        1.    Deluhery Is Seeking A Fail-Safe Class .......................................... 23

        2.    The Members Of The Proposed Class Are Not Readily Identifiable .......... 24

IV.    CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adashunas v. Negley*, 626 F.2d 600 (7th Cir. 1980) ........................................................................24

*Bakalar v. Vavra*, 237 F.R.D. 59 (S.D.N.Y. 2006) ........................................................................24

*Booth v. Electronic Data System Corp.*, 799 F. Supp. 1086 (D. Kan. 1992)......................................14

*Brazil v. Dell Inc.*, 585 F. Supp. 2d 1158 (N.D. Cal. 2008)...............................................................24

*Clarke v. JPMorgan Chase Bank, N.A.*, 2010 U.S. Dist. LEXIS 33264 (S.D.N.Y. March 26, 2010)...................................................................................................................................23

*Darvin v. International Harvester Co.*, 610 F. Supp. 255 (S.D.N.Y. 1985) .........................20, 22, 23

*Dauphin v. Chestnut Ridge Transport*, 2009 U.S. Dist. LEXIS 74483 (S.D.N.Y. Aug. 20, 2009)...................................................................................................................................16

*Davis v. Lenox Hill Hospital*, 2004 U.S. Dist. LEXIS 17283 (S.D.N.Y. Aug. 31, 2004) ................................................................................................................18, 21, 23

*Diaz v. Electronics Boutique of America, Inc.*, 2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 13, 2005)........................................................................................................... 21, 22

*Dunn v. Midwest Buslines, Inc.*, 94 F.R.D. 170 (E.D. Ark. 1982).....................................................24

*Fedotov v. Peter T. Roach and Associates, P.C.*, 354 F. Supp. 2d 471 (S.D.N.Y. 2005) ..................11

*In re: Fosamax Prod. Liability Lit.*, 248 F.R.D. 389 (S.D.N.Y. 2008) ..............................................24

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176 (2d Cir. 1990)................................................................................................................. 18, 19

*Genebacher v. CenturyTel Fiber Co. II*, 244 F.R.D. 485 (N.D. Ill 2007) ..........................................24

*Heffelfinger v. Electronic Data System Corp.*, 580 F. Supp. 2d 933 (C.D. Cal. 2008)...........13, 14, 16

*Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241 (C.D. Cal. 2006) ...........................................12, 17

*Lutz v. Ameritech Corp.*, 2000 U.S. App. LEXIS 3218 (6th Cir. Feb. 23, 2000) ..........................16

*Miles v. Merrill Lynch & Co.*, 471 F.3d 24 (2d Cir. 2006)...............................................................10

*Morgan v. Metropolitan District Commission*, 222 F.R.D. 220 (D. Conn. 2004)..............................11

*Morisky v. Public Serv. Electric & Gas*, 111 F. Supp. 2d 493 (D.N.J. 2000)...................................23

*Myers v. Hertz Corp.*, 2007 U.S. Dist. LEXIS 53572 (E.D.N.Y. July 24, 2007)..........................21

*Robinson v. Metropolitan-North Commuter RR*, 267 F.3d 147 (2d Cir. 2001), *cert. denied*,
535 U.S. 951 (2002) ...................................................................................................................11

*Savino v. Computer Credit, Inc.*, 164 F.3d 81 (2d Cir. 1988)................................................. 19, 20

*Spagnola v. Chubb Corp.*, 2010 U.S. Dist. LEXIS 1115 (S.D.N.Y.
Jan. 7, 2010) ..................................................................................................10, 17, 18, 21

*Traylor v. Pyramid Serv., Inc.*, 2008 U.S. Dist. LEXIS 73494 (C.D. Cal. Sept. 24, 2008)............15

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) .......................................16

*Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935 (9th Cir. 2009) ............................11, 13, 17

*In re: Wells Fargo Home Mortgage Overtime Pay Lit.*, 571 F.3d 953 (9th Cir. 2009) .....................13

*White v. Starbucks*, 497 F. Supp. 2d 1080 (N.D. Cal. 2007) ...........................................11

## STATE CASES

*Combs v. Skyriver Committee, Inc.*, 159 Cal. App. 4th 1242 (4th App. Dist. 2008)................ 14, 16

*Estate of Bonanno v. Connolly*, 80 Cal. Rptr. 3d 560 (Cal. App. 2d Dist. 2008) ...........................19

*Paul v. One Touch Technologies Corp.*, 2007 Cal. App. Unpub. LEXIS 5015 (Cal. App. 4
Dist. June 21, 2007)............................................................................................... 12, 16

## FEDERAL STATUTES

29 C.F.R. Part 541 ................................................................................................... 15, 16

Fair Labor Standards Act, 29 U.S.C. § 201, *et. seq* ....................................................................1

Fed. R. Civ. P. 23......................................................................................................... 10, 11

## STATE STATUTES

Cal. Lab. Code § 510...................................................................................................12

## I.   <u>INTRODUCTION</u>

Plaintiffs brought this lawsuit against Electronic Data Systems Corporation (EDS) in October 2007, claiming that EDS misclassified them as exempt from overtime under the Fair Labor Standards Act, 29 U.S.C. § 201, *et. seq*.  Plaintiffs also sought certification of the case as a collective action under Section 16(b) of the FLSA.  On May 29, 2009, Plaintiffs filed an Amended Complaint in which they added claims by Plaintiff Rod Deluhery that EDS also violated California law by misclassifying him as exempt from overtime and other wage requirements, and requested class certification of this claim under Rule 23 of the Federal Rules of Civil Procedure.  His proposed class includes all exempt EDS employees who performed computer-related duties within EDS' broad "3-series" professional job category in the State of California.

It is manifest that Rule 23 certification must be denied.  The significant variations in job duties among class members clearly preclude any determination based on generalized proof as to whether such employees qualify for various exemptions recognized under California law.  Instead, an individualized inquiry as to each employee's actual duties would be necessary.  Thus, Deluhery cannot show predominance or superiority under Rule 23(b)(3).

Deluhery also is an inadequate class representative under Rule 23(a), because he is equitably estopped from disclaiming verified information he gave EDS (and upon which EDS relied) showing he was properly classified as administratively exempt.  Furthermore, given the wide variance between employment settings and actual duties performed by members of the proposed class, Deluhery cannot prove commonality or typicality as required under Rule 23(a).

Finally, Deluhery is also seeking an improper fail-safe class, the members of which are not readily identifiable. Therefore, certification must be denied.

## II.  STATEMENT OF FACTS

### A.  Background.

The background facts that are relevant to this Motion, including EDS' business activities, its customers and their needs, and its job/function framework, are set forth in EDS' *Memorandum in Support of Motion to Deny FLSA Section 16(b) Collective Action Certification*. (Dkt. Etry. 83).   These facts are not repeated herein, but are incorporated by reference as though fully set forth.

### B.  EDS' California Operations.

Plaintiff Deluhery seeks a class of all individuals employed at EDS in Series 3 job codes who performed certain computer related tasks.  During the relevant time period, EDS had approximately 4,800 3-series employees in California at approximately 250 locations.   The number of such employees working at any given location ranged from 1 to more than 400.   The customers and accounts to which these individuals were assigned conducted business in a wide variety of industries, including government agencies, public utilities, armed services, and myriad private companies, just a few of which are described below.  (Ex. 33, Arnold Decl. ¶¶ 3, 17).[1]

#### 1.  The City of Anaheim Account.

At all relevant times, Deluhery worked on the EDS account with the City of Anaheim, California.  (Ex. 6, Deluhery Tr. 29, 40; Ex. 23, Deluhery Resume).  Working within City Hall, EDS provided full service IT outsourcing to the City, which encompassed managing the computer networks that support the City's police, fire, utilities, and other city services.  Deluhery worked in a *computer security administrator* role.  As the only EDS employee in this role, Deluhery had responsibility for setting direction and managing computer security for the City.  (Ex. 36, Chu Decl. ¶¶ 6-7).

Other EDS employees performed far different functions for the City.   For instance, a

---

[1] The declarations that more fully describe the various duties performed by EDS employees discussed herein have been submitted as part of EDS' *First Compendium of Evidence*, attached to the *Memorandum In Support Of Defendant Electronic Data Systems Corporation's Motion To Deny Section 16(b) Certification*.  (Dkt. Etry. 83, 84).

number of 3-series employees worked as part of an Application Development team.  That team provided computer application and management services such as analyzing, recommending, designing, and coding the computer systems and computer applications used by the City to support its municipal services.  (Ex. 36 ¶ 4).

While the EDS job functions varied significantly at the Anaheim account alone, the City was just one small EDS account in the State of California.  Because EDS tailored the services it delivered to meet each customer's needs, the work performed at other California accounts differed markedly.

**2.    U. S. Defense Manpower Data Center – Seaside, California.**

At EDS' United States Defense Manpower Data Center ("DMDC") account in Seaside, California, EDS was responsible for (among other things) management and administration of the Defense Enrollment Eligibility Recording System ("DEERS"), a military computer database that captures all administration and enrollment information for the military's health insurance programs.  (Ex. 38, Czaja Decl. ¶ 3).  In managing DEERS, EDS employees were divided into different teams, with each team having a different combination of 3-series employees.  Duties and tasks on each of the teams were almost entirely customer and/or project-driven.  (*Id.* ¶¶ 15-16).

For instance, employees in *application developer* roles used high-level computer programming skills to develop, design, modify and test computer applications.  (*Id.* ¶¶ 17, 19).  This work involved creating computer source code and documentation of the design and any relevant technical specifications.  (*Id.* ¶ 19).  These employees received assignments from other 3-series employees in *product manager* roles, who acted as their supervisor on projects, assisting as they planned their work on the project, providing feedback and appraising their work.

Employees in these *product manager* roles also were responsible for very high level design and development of computer applications, and for managing and planning application development. These complex projects involved creating systems or enhancement designs that fulfilled the customer's needs, documentation of the designs, and creation and documentation of technical

3

specifications.  To accomplish such demanding software application work, *project managers* on the J2EE team, for example, required specialized knowledge and experience in various computer platforms and applications.  (*Id.* ¶ 21, 30).

Other 3-series employees on this account served in *project manager* roles, with management responsibilities that included planning, assigning and directing the work of others, coordinating deadlines, reporting progress to the client, and facilitating meetings.  (*Id.* ¶ 23, 34-36).

3.   **EDS' California Department of Social Services and California Medi-Cal Accounts.**

Different still were the various EDS accounts that delivered services to customers who served California citizens receiving public assistance under various government programs.  For example, in Rancho Cordova, 3-series employees worked in a variety of roles on the Case Management, Information and Payrolling System II (CMIPS II) project, which is a computer system that tracks case information and processes recipient's benefits payments.  (Ex. 47, Lawson Decl. ¶¶ 3, 5). For instance, working directly with the customer, an employee in a *senior technical architect* role designed and coordinated implementation of the CMIPS II computer application.  To address system specifications and requirements, this employee oversaw the building, testing and adjusting of the system's applications.  (*Id.* ¶¶ 14-15).

Another 3-series employee on this project was in an *AIX administrator* role, regularly interacting with the customer's internal AIX team and jointly managing AIX production and development frame environments (which were hosted by the state).  (*Id.* ¶¶ 23-24).  Other employees performed different roles on this project including *Windows/VMware environment administrator* and *release and configuration management specialist.*  (*Id.* ¶¶ 18-22, 27).

On the other hand, EDS' Medi-Cal account in the U.S. Healthcare organization was responsible for management and administration of the computer infrastructure and technology that controls processing of medical claims made by citizens who receive medical insurance through the

State of California.  (Ex. 50, Meendering Decl. ¶ 3).  EDS 3-series employees performing in many different roles worked on teams dedicated to administering certain types of computer applications related to processing these medical claims. (*Id.*).  For example, one employee worked in a *team lead* role for a Disaster Recovery Team that performed functions critical to the viability of the entire system by planning, executing and testing various system applications to ensure that the computer system could recover during outages and other unforeseen events.  (*Id.* ¶ 27*).  This employee worked and consulted directly with the customer to develop drills to test the computer system.  (*Id.* ¶ 28-30).  Elsewhere on this account, employees working in *technical lead* roles not only worked as subject matter experts on applications, but created technical solutions and also provided management input on other team members.  (*Id.* ¶ 26).

### 4.    <u>Virtual Support of California Customers</u>.

A far different organizational and functional approach was embodied in the roles performed by a "virtual team" within EDS' Western Hub organization that provided a wide range of IT services to EDS customers including California Blue Cross/Blue Shield and San Diego County.  (Ex. 48, McConnell Decl. ¶¶ 3-5).  This team included 3-series employees who worked in various *batch management analyst* roles.  Driven by specific customer requirements and on a project-by-project basis, employees in these roles were responsible for implementing, administering and managing the entire process by which EDS customers executed a series of programs on their computer system without manual intervention.  They consulted with the customer, performed "due diligence" on the customer's computer systems, capabilities and resources, determined the customer's needs, and then designed and presented recommendations to the customer on the best and most efficient way to implement the project.  (*Id.* ¶¶ 6, 11-19).

### 5.    <u>Computer Systems Analysis For California Customers</u>.

Also in the proposed class are employees who provided some of the most technical computer systems analysis and development work performed by EDS.  One such employee worked in a

*consulting* role for the Consulting Solutions organization, developing and maintaining a global Web-based warranty claim administration software application for Sony Ericsson mobile communications equipment. (Ex. 41, Ferguson Decl. ¶¶ 3-4). He also resolved complex business problems associated with the application and formulated and implemented business strategies to fulfill the needs of the customer. Consequently, he worked with the customer to create business and technical designs and to develop various components of this application. (*Id.* ¶ 5). Three-series employees in *application architect* roles for the EDS Applications Services Organization designed and developed computer applications for companies such as Ryder Truck and public entities such as the California Department of Corrections, and made recommendations to customers concerning improving the functionality of those systems. (Ex. 57, Stephenson Decl. ¶¶ 3, 21-22).

### C.      Plaintiff Rod Deluhery's Employment With EDS.

From 2002 until his separation, Deluhery worked on the City of Anaheim account. (Ex. 6 at 7, 29, 40; Ex. 23). In 2008 and 2009, he performed the role of *computer security administrator,* managing security policies and coordinating new computer security technologies for the City. (Ex. 23). Deluhery was the only employee to work in a *security administrator* role on the Anaheim account, and he cannot identify a single EDS employee in California who performed similar duties. (Ex. 6 at 138-139, 142; *see also* 134-136).

Before managing computer security, Deluhery managed networks, servers and associated infrastructure for the Anaheim Police Department. (Ex. 23). For instance, he was "the lead manager for implementation of a new police dispatch system," a large, important project that resulted in the implementation of a "24/7" dispatch system. (Ex. 23; *see also* Ex. 6 at 51-53).

Deluhery also took a leadership role in creating requests for proposals (RFP) on behalf of the City. For instance, he created an RFP for encryption software to replace an outdated system (Ex. 23), and on another occasion, spearheaded the bid and ultimate design of a storage area network for the Police Department. (Ex. 6 at 57-58, Exs. 22, Project Description; Ex. 23).

Given his specialized day-to-day functions, Deluhery recognized early on that he performed exempt work.  On August 4, 2004, he reported to a co-worker that he had reviewed the California overtime exemptions and agreed that he should be classified as administratively exempt.  (Ex. 6 at 32-33; Ex. 19, 8/04/04 e-mail).

Deluhery later unambiguously represented to EDS that he performed job functions that fell squarely within the administrative exemption.  In early 2007, he responded to an EDS job summary questionnaire (JSQ).[2]  In submitting the JSQ, Deluhery represented that the "information provided in [the JSQ] is true and accurate to the best of my knowledge."  (Ex. 26, Deluhery Answers to Request for Admissions, p. 5).  Deluhery's JSQ response indicated that he worked "under minimal supervision."  He also acknowledged that he had "authority to exercise independent discretion in performance of almost every main job responsibility."  (Ex. 26, p. 4).

Deluhery also selected a description that best described his primary job functions at the time to include, among other things, that "[u]nder general direction" he "designs, tests, implements, and optimizes portions" of networks, "[i]nvestigates, analyzes and recommends solutions to performance problems to enhance functionality, reliability, and/or usability," and that he performed various computer systems analysis functions to meet customer needs.  (Ex. 26, p. 2).

Deluhery had no reason to believe that EDS would not rely upon his verified answers.  (Ex. 6 at 107).  As a result of his representations, EDS was satisfied that Deluhery was properly classified as exempt from state and federal overtime requirements and he remained classified as exempt.  (Ex. 42 ¶ 11).

---

[2] During 2006-7, EDS conducted a voluntary internal audit under the supervision of the U.S. Department of Labor to determine whether employees in certain positions were properly classified as exempt from overtime under the FLSA.  EDS developed a JSQ (which was approved by the DOL) and provided it to each employee covered by the audit to obtain his own view of his daily duties and responsibilities.  EDS then relied upon verified responses from employees in determining whether to reclassify employees into non-exempt positions, or whether they should continue in an exempt (and generally higher paid) position.  (Ex. 42, Evans Dec. ¶¶ 5-10).

In 2008, to address the City's need to safeguard its computer environment, Deluhery was assigned to work as the City's computer *security administrator*. (Ex. 36 ¶ 5). In this role, Deluhery was security coordinator for all Police Department IT projects. (*Id.*; *see also* Ex. 6 at 164-165, 167-169; Ex. 20, Proposal at EDS 14309; Ex. 21, Proposal at EDS 33783). As such, the Police Department looked to Deluhery regarding new technology, and Deluhery would study available technologies and make recommendations to the City. (*Id.; see also* Ex. 6 at 208-214; Ex. 15, 2/18/09 e-mail; Ex.16, 11/13/08 e-mail).

Deluhery met with the client to discuss projects and security concerns and also directly assumed responsibility for projects. Among other things, he assessed various production and data security programs and technologies, including intrusion detection systems. He also created and tested security applications for wireless computer access and utilized reverse engineering techniques to uncover a security issue with VPN software. (Ex. 23). Piloting a new two factor authentication project for the Police Department, Deluhery also recommended changes to PDA and laptop security such as drive lock and encryption and was responsible for implementing processes to ensure a secure server environment. (Ex. 36 ¶ 6).

Deluhery continued to work under minimal supervision in this role. On that score, a 2009 forensic review of Deluhery's work computer revealed startling results. This review indicated that Deluhery had spent significant blocks of time visiting pornographic and other non-business websites during his EDS employment. (Ex. 33 ¶ 21). He even had gone so far as to take time out of his work day to send email to a pornographic model (Ex. 6 at 172-173). This review uncovered over 20,000 images of pornographic and other non-business materials housed on Deluhery's work computer, which was owned by the City and issued to him for use on City-related business only. (Ex. 33 ¶ 21; Ex. 36 ¶8).[3]

---

[3] Deluhery also spent considerable time working on matters for a company named PRIDE that he formed with his brother. Deluhery's work computer contained RFP responses to the Federal

**D.**     **The Only Other California Employee to File a Consent Form Performs Entirely Different Job Functions Than Deluhery.**

Hugo Hernandez is the only other California EDS employee to file a consent form joining the FLSA portion of this case.  Hernandez was hired by EDS in 2005 to work on its Navy Marine Corps Intranet (NMCI) account.  (Ex. 8, Hernandez Tr. 45-47, 76-77; Ex. 30, Hernandez Resume).  NMCI is a massive intranet that provides an integrated and consolidated email and network operating system used by over 700,000 users in the U.S. Navy and Marine Corps.  (Ex. 34, Bartlett Decl. ¶ 3).

Since joining EDS, the work Hernandez performed remained basically the same.  At the Network Operations Center located in the San Diego Naval Air Station,  Hernandez was part of the CCOE (Customer Centers of Excellence) messaging team.  That team was divided into "problem management" and "change management" teams.  (Ex. 8 at 48-49, 53-55; Ex. 30).  Hernandez' role was an *exchange administrator-incident response member* of the problem management team.  (Ex. 30).  This team focused on resolving problems on the intranet.  Among other things, Hernandez was responsible for solving critical message outages in the system and providing root cause analysis of exchange outages and other messaging related issues (which involved proactive investigations and monitoring).  (*Id.*; *see also* Ex. 6 at 81-83).

The Navy and Marine Corps established service level agreements (SLA) upon which EDS' service levels were measured.  (Ex. 6 at 90).  Part of Hernandez' role was to act as "messaging service level agreement coordinator," which involved analyzing data and providing root cause analyses when EDS failed to meet messaging SLAs.  (Ex. 30; *see also* Ex. 6 at 90, 161-3).

In early 2007, Hernandez also responded to an EDS JSQ.  (*Id.* at 114-116; Ex. 25 Hernandez JSQ).  In his verified answers, Hernandez stated he worked under "general supervision with limited

---

Government that PRIDE submitted (while he was working for EDS) in which Deluhery attempted to obtain computer security projects.  (Ex. 33 ¶ 22; *see also* Ex. 6 at 151-171; Exs. 17, 18, 20, 21).  In these submissions, Deluhery touted his computer systems analysis and security acumen.  *(Id.).*

daily guidance or direction." (Ex. 25, p. 4-5). He also indicated that while established processes may exist, he had "authority to modify procedures without specific approval from his manager," and that his primary "functions are non-routine in nature and routinely require independent decision-making on matters of importance." (Ex. 25, p. 4). In addition, Hernandez identified his primary job functions as involving complex computer systems functions that fell neatly into the administrative exemption. (Ex. 25, p. 2). Later in 2007, Hernandez's job code was reassigned from systems administrator to infrastructure specialist, but his role remained the same. (Ex. 6 at 53, 108-109; Ex. 24). He continued to work independently and perform technical systems analysis without direction. (*See, e.g., Id.* at 144-145; Ex. 24, Hernandez 2007 Performance Evaluation, p. 8).

## III.   DELUHERY'S CLASS CLAIMS SHOULD BE DISMISSED

"[U]nder the legal standards recently clarified by the Second Circuit, Plaintiffs now face a significant burden to show that class certification is appropriate." *Spagnola v. Chubb Corp.*, 2010 U.S. Dist. LEXIS 1115 at *41-42 (S.D.N.Y. Jan. 7, 2010). Class certification is prohibited absent a "rigorous analysis" to determine whether the plaintiff has met FRCP 23's substantial prerequisites. *Miles v. Merrill Lynch & Co.*, 471 F.3d 24, 33 (2d Cir. 2006). To overcome this burden, a plaintiff must first prove by a preponderance of the evidence that each of Rule 23(a)'s requirements - numerosity, commonality, typicality, and adequacy of representation – has been satisfied. *See* FRCP 23(a); *Miles*, 471 F.3d at 41. The plaintiff must **affirmatively establish** each element, and cannot satisfy this burden simply by producing "some" evidence pertaining to these requirements. *Id.*

If Rule 23(a) is satisfied, class certification still is improper unless the plaintiff also establishes one of Rule 23(b)'s prerequisites. Deluhery seeks class certification under Rule 23(b)(3). This rule permits certification only where the plaintiff proves that common questions of law or fact

"predominate" over individual issues and that a class action is "superior to other available methods for fair and efficient adjudication."[4]

Rule 23(c)(1) requires a court to decide the class certification issue at "an early practicable time." While the question of class certification is often raised by plaintiff's motion, it is well-settled that a "defendant need not wait for the plaintiff to act . . . [and] may move for an order denying class certification." *Fedotov v. Peter T. Roach and Associates, P.C.,* 354 F.Supp. 2d 471, 478 (S.D.N.Y. 2005); *see also Vinole v. Countrywide Home Loans, Inc.,* 571 F.3d 935, 939-940 (9th Cir. 2009) (upholding defendant's right to seek denial of a California overtime class even before plaintiff's motion). Of course, the burden of establishing the Rule 23 elements remains with the plaintiff. *Fedotov,* at 478.

As demonstrated below, the class Deluhery proposes cannot survive Rule 23 analysis. Therefore, certification of that class should be denied.[5]

## A.    Deluhery's Proposed Class Fails Under Rule 23(b)(3).

The primary question in this case—whether the putative class is exempt from California overtime requirements—would require an individual analysis of (i) which duties each class member

---

[4] Deluhery also requested certification under Rule 23(b)(2) in his Second Amended Complaint. However, this argument was specifically abandoned in response to EDS' Motion to Strike. (Dkt. 55, p. 5 "[M]onetary damages predominate over any injunctive relief that Plaintiffs would be able to obtain.") Moreover, Deluhery's status as a former employee would preclude Rule 23(b)(2) class certification of his proposed class. Rule 23(b)(2) is satisfied only where the plaintiff's request for injunctive relief predominates over any claim for monetary damages. Fed. R. Civ. P. 23(b)(2); *Robinson v. Metro-North Commuter RR,* 267 F.3d 147, 164 (2d Cir. 2001), *cert. denied,* 535 U.S. 951 (2002). As one court succinctly explained in denying Rule 23(b)(2) certification under *Robinson:* "[F]or former employees, their incentive to join the class is **monetary relief.**" *Morgan v. Metropolitan Dist. Comm'n,* 222 F.R.D. 220, 236 (D. Conn. 2004) (emphasis added).

[5] While Deluhery also seeks Rule 23 certification on claims for improper record-keeping, waiting time penalties, missed meal periods and unfair competition under California law, these claims all flow from Deluhery's allegation that putative class members were improperly treated as exempt. Thus, because Rule 23 certification must be denied on Deluhery's misclassification claim, certification must be denied on these claims as well. Moreover, Deluhery's missed meal period claim would require an individual, case-by-case analysis of whether meal periods and rest breaks were made available in each of the over 271 EDS locations at issue. *See, e.g. White v. Starbucks,* 497 F. Supp. 2d 1080 (N.D. Cal. 2007) (employer must only make meal periods and rest breaks available to employees, not affirmatively enforce them).

performed, (ii) which overtime exemptions might apply to such duties, and (iii) whether each employee spent more than 50% of her work time on exempt duties.  Because these issues are not subject to generalized proof, certification must be denied.  *See Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241 (C.D. Cal. 2006).

1.      <b><u>Common Questions Would Not Predominate</u></b>.

Subject to certain exemptions, the California Labor Code provides that certain employees are entitled to one and one-half times their regular rate for hours worked over 8 in a day or 40 in a week.  *See* Cal. Lab. Code § 510(a).  The Industrial Welfare Commission has published regulations defining the categories of employees who are exempt from these requirements.  These exemptions apply to employees who exercise discretion and independent judgment and whose *primary duty* (defined as more than one-half their work time) is devoted to working in a bona fide executive, administrative, or professional capacity.  Wage Order 4-2001(1)(A)(1)-(3) and 2(N).  California also recognizes a "computer exemption" that applies to employees in the computer software field who exercise discretion and independent judgment in performing specified types of computer-related tasks and who earn a certain wage rate.  Lab. Code § 515.5.

The Wage Order specifically incorporates the FLSA regulations in defining the activities covered by the executive, administrative, and professional exemptions under California law.  *See* Wage Order 4-2001(1)(A)(1)(e), (A)(2)(f), and (A)(3)(e).  California courts likewise construe the exemptions in accordance with the FLSA exemptions.  *See Paul v. One Touch Technologies Corp.*, 2007 Cal. App. Unpub. LEXIS 5015 n.1 (Cal. App. 4 Dist. June 21, 2007).  Whether a particular employee falls into one of the specified exemptions is determined based on the duties that employee performs, and not on his job code.  *Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241 (C.D. Cal. 2006); Wage Order 4-2001(1)(A)(3)(h)(iii) (a "job title shall not be determinative of the applicability of [the computer] exemption.")

12

Though Deluhery claims that putative class members share the common question of whether they were properly treated as exempt (*see* Sec. Am. Compl. ¶ 51), he is unable to satisfy the predominance requirement of Rule 23(b)(3).  At the outset, had Deluhery brought this action in California, his contention that a common question predominates by virtue of EDS' classification of all 3-series employees as exempt would be summarily rejected.  Recently, in *In re: Wells Fargo Home Mortgage Overtime Pay Lit.*, 571 F.3d 953, 959 (9th Cir. 2009), the Ninth Circuit held that Rule 23(b)(3) predominance cannot be shown merely by challenging an employer's classification of employees across job classifications as exempt.  Reversing class certification, the court explained that a "blanket exemption policy does nothing to facilitate common proof" and does not eliminate the need for individualized factual determinations as to whether class members actually perform similar duties. *Id.*; *see also Vinole v. Countrywide Home Loans, Inc.,* 571 F.3d 935 (9th Cir. 2009).

Deluhery's proposed California class illustrates perfectly the reason the Ninth Circuit refuses to certify California overtime class actions based simply on challenges to "uniform" treatment of employees as exempt.  Undisputed evidence shows that putative class members perform a wide variety of dissimilar duties.  These duties stand in marked contrast to those performed by Deluhery.  Hence, he cannot show any predominant factual question.

Deluhery also is unable to establish a predominant legal question because he cannot show that the practice of classifying putative class members as exempt resulted in class-wide misclassi-fication.  At least one federal court in California already has held that hundreds of putative class members perform exempt work.  *Heffelfinger v. Electronic Data Sys. Corp.*, 580 F. Supp. 2d 933 (C.D. Cal. 2008) (appeal pending).  In *Heffelfinger*, the court held that employees in the EDS 3-series infor-mation specialist senior, senior systems administrator, systems engineer and information analyst job codes were exempt under the California administrative exemption as a matter of law.

The duties of the *Heffelfinger* plaintiffs included representing customers to outside vendors, recommending changes to customer computer systems, coordinating and directing other team

13

members' work, high-level problem-solving, implementing database tools, and writing applications based on the needs of the customer. *Id.* at 938-41. The court held that these employees were properly considered exempt under Wage Order 4-2001. *Id.* at 957-968. As the court succinctly concluded: "*The undisputed evidence shows that members of the class are administrative workers for purpose of California law.*" *Id.* at 968. *See also Booth v. Electronic Data Sys. Corp.*, 799 F. Supp. 1086 (D. Kan. 1992) (EDS software engineers are exempt administrative employees under the FLSA).

Thus, there can be no common legal issue upon which to fashion a judgment that would apply across the entire proposed class. Almost 500 California 3-series employees were held to be exempt by the *Heffelfinger* court as a matter of law. (Ex. 33 at ¶ 17). Thus, the challenged practice on which Deluhery bases his class claims is not subject to generalized proof because it already has been held not to have resulted in a common practice of misclassification.

The fact that there are hundreds of putative class members who have been judicially determined to be administrative exempt should hardly surprise Deluhery. He reported to EDS in February 2007 that the job functions of his role for the City of Anaheim fell within the administrative exemption. (Ex. 26). Deluhery's management of all computer security projects for the City in 2008 and 2009 further confirms his exempt status. *See* Wage Order 4-2001(1)(A)(2) (exemption applies to performing work directly related to management policies or the general business operations employer's customers); *Heffelfinger*, *supra*; *Combs v. Skyriver Comm., Inc.*, 159 Cal. App. 4th 1242, 1265 (4th App. Dist. 2008) (plaintiff's primary duty was "maintaining the well-being of [the employer's computer] network.")

Moreover, were Deluhery now to attack the decision in *Heffelfinger* by arguing that individuals covered by that case do not actually meet the administrative exemption, he necessarily will have to rely upon an individual inquiry on such issues as whether each employee exercised sufficient independent judgment and discretion in performing his job and/or whether he spent more than 50% of his time performing exempt work. However, this is precisely the type of non-generalized proof and

individualized inquiry upon which class certification cannot be maintained.  Consequently, Deluhery cannot maintain a class under Rule 23(b)(3) for this reason alone.

Deluhery also cannot show Rule 23(b)(3) predominance because the proposed class members' duties varied significantly and do not simply fall under a single exemption.  Instead, multiple exemptions are implicated and an individualized analysis of each putative class member's job duties and time spent performing those duties is necessary.

For instance, the development and continued modification of the Web-based warranty claim application performed by an employee in a *consulting* role, as well as the design and development of the CMIPS II by an employee in a *senior technical architect* role, is exactly the type of customer driven systems analysis that falls directly under the California computer exemption.  (Ex. 41 ¶ 4; Ex. 47 ¶ 14).  Labor Code § 515.5(a)(2) (exempt work includes design, development, documentation, analysis, creation, testing, or modification of computer systems or programs based on and related to user or system design specifications).

In addition, employees such as those in a *product manager* role for the DMDC account and others who lead teams of EDS employees perform work duties that fall within the executive, administrative, and computer exemptions.  (*See, e.g.,* Ex. 38 ¶¶ 23, 34-36).  Both federal and California law recognize that an employee whose primary duty involves a combination of exemptions may qualify for exemption.  29 C.F.R. § 541.708; *Traylor v. Pyramid Serv., Inc.,* 2008 U.S. Dist. LEXIS 73494,*6 n.3 (C.D. Cal. Sept. 24, 2008) (citing similar California combination exemption).  Such analysis is entirely specific to each employee and not subject to common proof, which further defeats Rule 23(b)(3) predominance.

Within just the administrative exemption, exempt status cannot be resolved without an individualized inquiry into the duties performed by each purported class member and the time spent performing exempt work.  By his own admissions, there is little dispute that Deluhery's work fell within the administrative exemption.  Moreover, EDS has shown that numerous 3-series employees

provided different and varied high-level IT work for EDS' customers.  (*See, e.g.,* Exs. 38, 47, 48, 50). Both court decisions and applicable regulations confirm that employees who provide such IT services fall within the administrative exemption.  *Heffelfinger, supra; Combs, supra; Paul,* 2007 Cal. App. Unpub. LEXIS 5015 at \*17 (plaintiff was administratively exempt where he advised customers in developing, configuring and implementing software);  *Lutz v. Ameritech Corp.*, 2000 U.S. App. LEXIS 3218 (6th Cir. Feb. 23, 2000) (employee who established and maintained access to his employer's corporate-wide computer network administratively exempt); 29 C.F.R. § 541.402 (2007) ("[c]omputer employees [fall] within the [administrative exemption] . . . if their primary duty includes work such as planning, scheduling, and coordinating activities required to develop systems to solve complex business, scientific or engineering problems of the employer or the employer's customers."); *Prior* 29 C.F.R. § 541.205(c)(7).

This Court has rejected claims of Rule 23(b) predominance where putative class members are not similarly positioned in regard to the application of one or more overtime exemptions.  In *Dauphin v. Chestnut Ridge Transp.*, 2009 U.S. Dist. LEXIS 74483 (S.D.N.Y. Aug. 20, 2009), the plaintiff truck drivers claimed they were misclassified as exempt under New York's motor carrier exemption.  Noting that a Rule 23(b)(3) common question is one that is "subject to generalized proof and . . . applicable to the class as a whole," this Court denied class certification, basing its holding on the fact that there was "a strong possibility . . . that the common carrier exemption will apply to some – but not all – CR Transportation drivers."  *Id.* at \*11-12.

Here, there is no common question that is "subject to generalized proof" or "applicable to the class as a whole."  Thus, certification should be denied.

## 2.        A Class Action Is Not Superior To Other Forms Of Adjudication.

Rule 23(b)(3)'s superiority requirement requires a plaintiff to demonstrate that "no realistic alternative exists" to pursuing the claims of absent class members.  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996).  Deluhery cannot make this showing.  Rule 23(b)(3)(C) specifi-

16

cally requires consideration of "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." Deluhery can provide no justification for concentrating the state law claims of all other California employees in this Court, foisting upon them the burden of opting out of the proposed class (and his representation of it) just to preserve their right to pursue their own claims in their home state.

Further, to fall under the Cal. Wage Order's various exemptions, the employee must spend more than 50% of his work time on exempt functions. Wage Order 4-2001(1)(A)(1)-(3) and (2)(N). Given the disparity in duties explained above and the need to address how each individual member of the class spends the majority of his work day, the Court will be required to examine the unique circumstances of individual class members and to conduct a "mini-trial" for each one to determine whether he primarily performed exempt work. "The greater the number of individual issues, the less likely that superiority can be established." *Spagnola*, at *68.

*This is particularly true under California law.* Where nothing can absolve the need for the Court to determine how the proposed class members spend their work day, class certification should be denied. *E.g. Vinole*, 571 F.3d 946-947 (certification denial upheld because plaintiffs could show no issues of common proof to "ameliorate the need to hold several hundred mini-trials with respect to each [employee's] actual work performance."); *Jimenez*, 238 F.R.D. at 252 (refusing to certify class because "the predominating issue in this case is the actual mix of duties worked which entails a need to conduct an individual inquiry for each class member.")

The *Heffelfinger* court already has held that a significant portion of the putative class members are exempt. In addition, EDS has established that the actual duties of some of the putative class members fall within one or more of the California overtime exemptions. Hence, it is indisputable that putative class members performed at least **some** exempt duties. Their exempt status therefore will depend upon whether each employee spent over 50% of his work day on exempt work. This question necessarily requires an employee-by-employee, day-by-day and week-to-week analysis for

each class member.   Accordingly, Deluhery asks the Court to conduct potentially hundreds of individual mini-trials without any hope of increased efficiency or economy.   *See Spagnola*, at *68-69 ("[T]he need for mini-trials on the resolution of each class member's claims and the applicability of affirmative defenses detracts from the superiority of the class action device, to say the least"); *Davis v. Lenox Hill Hospital,* 2004 U.S. Dist. LEXIS 17283 at *20 (S.D.N.Y. Aug. 31, 2004).

The claims in this case will ultimately turn on the particular facts and circumstances of each prospective class member's claims, including the identity of their leaders, the needs of the customer, the specific duties assigned to each class member to meet these customer needs, the amount of time allocated to each of these specific duties, and whether their status was affected as a result.   These individual determinations would degenerate in practice into a series of multiple, fragmented lawsuits, separately tried.   *See Spagnola*, *supra*.   This reduces the superiority of the class action device for adjudicating the putative class members' claims beyond utility.

**B.**   **Deluhery's Proposed Class Also Fails Under Rule 23(a).**

**1.**   **Deluhery Is Not A Proper Class Representative Under Rule 23(a).**

The Court can reject Deluhery's proposed class without even reaching Rule 23(b), however, because he is unable to satisfy the requirements of Rule 23(a).   The Second Circuit has recognized that "[r]egardless of whether the issue is framed in terms of the typicality of the representative's claims or the adequacy of its representation, there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."   *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) (internal citations omitted).

Here, Deluhery will be preoccupied with EDS' defense of equitable estoppel based upon his express representations to EDS in the 2007 JSQ.   In straightforward terms, the JSQ asked Deluhery to indicate the level of supervision he received, how much independent discretion he exercised and to identify his primary job functions.   (Ex. 26, p. 4).   In answers he verified were "true and accurate," Deluhery represented that in his role on the Anaheim account, he worked "under minimal

supervision," had "authority to exercise independent discretion in performance of almost every main job responsibility," and identified job functions that fell squarely within the administrative exemption. *Id.*; *see also* Cal. Wage Order 4-2001(1)(A)(2). Based upon this response, Deluhery remained in exempt status and received compensation commensurate with the level of work he stated he performed. (Ex. 42 ¶ 11).

Under California law, the defense of equitable estoppel applies where (1) the party to be estopped is apprised of the facts; (2) he intends that this conduct shall be acted upon, or must so act that the party asserting the estoppel had the right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) the other party must rely upon the conduct to his injury. *See Estate of Bonanno v. Connolly,* 80 Cal. Rptr. 3d 560, 571 (Cal. App. 2d Dist. 2008). All of these elements are met here. On the JSQ, Deluhery represented facts upon which EDS relied in confirming his exempt status and paying him accordingly. Even Deluhery admits that he had no reason to believe that EDS would not rely upon his truthful answers to the JSQ. (Ex. 6 at 107). In addition, EDS did in fact rely on those representations in determining that Deluhery should remain an exempt employee. (*See* Ex. 42 ¶ 11). Because a central and dominant focus of this litigation will be the effect of Deluhery's verified representations in the JSQ, this unique defense will preoccupy his claim and render him an inadequate class representative.

Moreover, the Second Circuit has held that a district court "may consider the honesty and trustworthiness of the named plaintiff" in judging adequacy of class representation. *Savino v. Computer Credit, Inc.,* 164 F.3d 81, 87 (2d Cir. 1988). Here, Deluhery verified his exempt status in 2007 in his JSQ responses, and reaffirmed the truth of that response in this litigation. (Ex. 26). Also, when submitting responses to Federal RFPs on behalf of PRIDE in 2009, Deluhery represented that the work he was performing for EDS constituted high-level project management

and consulting work.[6]  Notwithstanding these representations, Deluhery now claims he worked in a non-exempt capacity.  Such blatant contradictions on facts central to the issues in this lawsuit preclude Deluhery from adequately representing the proposed class.

In *Savino*, the court upheld the finding of inadequate representation where the named plaintiff offered "differing accounts" about matters "that formed the very basis of his lawsuit" because this "surely would create serious concerns as to his credibility at any trial."  *Id.* at 87.  This case is no different.  Deluhery's previous admissions cast serious doubt as to the credibility of his newfound contention he was performing routine, non-exempt work.  As a result, he cannot adequately represent the class.

Deluhery also faces a unique defense to his claim for damages.  Deluhrey's devotion to surfing the Internet for pornographic and other non-work-related websites was unrelenting.  Stated simply, Deluhery's satisfaction of his prurient interests does not constitute compensable work time.  Nor should he be compensated for the time he spent creating and operating competing businesses such as PRIDE.  Because Deluhery's non-work activities present yet another unique defense, he cannot adequately serve as class representative.

Deluhery's inadequacy as a class representative is further confirmed by his unawareness of the duties and functions of the members of the purported class.  Deluhery alone performed computer security administration for the City of Anaheim.  (Ex. 6 at 138).  He admittedly does not know what any other EDS employees outside of the Anaheim account did on a daily basis (*Id.* at 136), and there is no evidence that any other EDS employee in California performed the same duties as Deluhery.  Because he does not know his own class, Deluhery cannot "fairly and adequately protect the interests of the class" as required by Rule 23.  *See, e.g., Darvin v. Int'l Harvester Co.*, 610 F. Supp. 255, 256 (S.D.N.Y. 1985).

---

[6] Given the potential ramifications to Deluhery of making false representations to the U.S. Government in proposals involving homeland security projects (*see* Exs. 6, 17, and 33), it is unlikely that his description of his EDS role was not accurate.

2.    __The Proposed Class Fails For Lack Of Commonality And Typicality__.

Deluhery's request for class certification also fails because he cannot meet Rule 23(a)'s commonality and typicality requirements.  "The commonality requirement of Rule 23(a) requires a plaintiff to show that the action raises an issue of law or fact that is common to the proposed class." *Davis v. Lenox Hill Hosp.*, 2004 U.S. Dist. LEXIS 17283 at *17 (S.D.N.Y. Aug. 31, 2004).  The typicality element requires the plaintiff to show that his claims arise from the same facts as those of the absent class members and are based on similar legal arguments.  *Spagnola*, 2010 U.S. Dist. LEXIS 1115 at *46.  These two criteria "tend to overlap and are often considered together."  *Myers v. Hertz Corp.*, 2007 U.S. Dist. LEXIS 53572 at *11 (E.D.N.Y. July 24, 2007).

In an overtime case, the commonality and typicality criteria are satisfied only if the differences among putative class members are limited to hours worked, wages paid, and/or other damages issues.  If they performed different duties, class certification must be denied.  *See, e.g., Myers, supra*.  While this issue forecloses certification under the "much more stringent" Rule 23(b)(3) predominance requirement, it is equally fatal to Deluhery's attempt to demonstrate Rule 23(a) commonality and typicality.  *See Spagnola*, at *63-64.  For example, in *Myers, supra*, the plaintiff managers sought Rule 23 class certification claiming that they were misclassified as exempt.  The named plaintiffs worked at only one of the defendant's 60 locations they sought to include in the class.  The court held that the plaintiffs could not show commonality because they could not demonstrate that all putative class members at all 60 locations performed the same duties.  The court acknowledged other overtime cases where the commonality requirement was satisfied, but distinguished them on the basis that differences among class members in those cases concerned only damages issues.  *Id.* at *11-14.

Similarly, in *Diaz v. Electronics Boutique of Am., Inc.*, 2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 13, 2005), a group of retail managers requested class certification asserting that all managers were misclassified under the same job description, while the employer argued that class certification

was inappropriate because the duties performed by managers at different locations varied. *Id.* at *11-12. The court denied certification because "an individual factual determination [was] necessary to . . . determine if an SM should be exempt or nonexempt . . . [and] plaintiffs fail to meet the commonality requirement of FRCvP 23(a)." *Id.* at *23.

Deluhery's situation is even more pronounced. He has no knowledge of the work performed by employees in any other California location. (Ex. 6 at 136). Because Deluhery must affirmatively **prove** commonality and typicality, his lack of knowledge precludes certification. *See, Darvin*, *supra.* Moreover, the fact that putative class members' duties differed significantly from employee to employee precludes any finding of a common factual question. Similarly, as shown above, the fact that these divergent duties are covered by multiple exemptions precludes any finding of a common question of law.

Deluhery is illustrative in this regard. Deluhery was the only Anaheim account employee in a *computer security administration* role. In contrast, undisputed evidence shows that other 3-series employees performed none of the computer security administration functions Deluhery provided for the City. For instance, an employee in a *consulting* role in the Consulting Solutions organization designed and modified a complex Web-based warranty application used by EDS customer Sony Ericsson, while an employee on the Medi-Cal account was the *team lead* of the Medi-Cal Disaster Recovery Team working with the customer to develop applications to ensure that the Medi-Cal computer network would not lose critical data. (Ex. 41 ¶ 4; Ex. 50 ¶ 27).

Other employees in the proposed class include those in *project manager* roles for the DMDC account who supervised projects of other EDS workers and also performed high-level system design and enhancement, and West Hub virtual team members in *batch management analyst* roles who worked on customer-specific projects to allow customers to execute series of computer programs in the most cost-effective and efficient way. (Ex. 38 ¶¶ 21, 30; Ex. 48 ¶¶ 6, 13). Opt-in Plaintiff Hernandez also had vastly different job duties than Deluhery.

There is no evidence that any other EDS employee performed daily duties similar to those Deluhery performed and undisputed evidence shows that members of the class he seeks had materially dissimilar jobs. Therefore, Deluhery's claims are not typical of the putative class. *See, e.g., Davis,* 2004 U.S. Dist. LEXIS 17283 at *20; *Darvin,* 610 F. Supp. 255 at 256; *Morisky v. Pub. Serv. Elec. & Gas*, 111 F. Supp. 2d 493, 500 (D.N.J. 2000).

## C.    Deluhery's Proposed Class Definition Is Facially Impermissible.

Finally, Deluhery' proposed class definition cannot survive even threshold scrutiny. His proposed class would include current and former EDS employees in California who were assigned a 3-series job code. He does not, however, seek to represent **all** such employees. Rather, Deluhery proposes a class that would be limited to individuals in 3-series positions "with the primary duties of installing, maintaining and/or supporting computer software and hardware." (Sec. Am. Compl. ¶ 3). This class definition fails by its own terms.

### 1.    Deluhery Is Seeking A Fail-Safe Class.

Deluhery is using the "install/maintain/support" qualifier as an avatar for "non-exempt." This phrase, which has no relation to EDS job code descriptions, is lifted from Department of Labor opinion letters suggesting that certain install/maintain duties are non-exempt under the FLSA, *i.e.,* employees engaged in "installation of computer systems . . . and software" and/or who "maintain[ed] a computer system." *See* DOL Wage and Hour Opinion Letters Aug. 19, 1999 and Oct. 26, 2006.[7] Moreover, Deluhery seeks to include in his proposed class only those individuals who perform such purportedly non-exempt functions as their **primary** duty. Thus, in shorthand, Deluhery seeks a class of "all persons who were, are or will be employed by EDS in California, ***in exempt positions that should have been treated as non-exempt.***"

---

[7] Notably, these same opinion letters were recently referred to as "unpersuasive" by Judge Colleen McMahon in this District. *Clarke v. JPMorgan Chase Bank, N.A.,* 2010 U.S. Dist. LEXIS 33264 at *57 (S.D.N.Y. March 26, 2010).

This is the epitome of an impermissible fail-safe class, where class members can only be bound by a favorable judgment. *See Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980); *see also Brazil v. Dell Inc.*, 585 F. Supp. 2d 1158, 1167 (N.D. Cal. 2008); *Genebacher v. CenturyTel Fiber Co. II*, 244 F.R.D. 485, 488 (N.D. Ill 2007) ("This type of class definition is called a "fail safe" class because the class definition precludes the possibility of an adverse judgment against class members; the class members either win or are not in the class"); *Dunn v. Midwest Buslines, Inc.*, 94 F.R.D. 170, 172 (E.D. Ark. 1982).

Deluhery's proposed class would require the Court to determine whether each putative class member was exempt under California law ***before*** deciding whether the individual could be included in the class. Once EDS proved that a particular plaintiff was exempt, that plaintiff would no longer fit the class definition. Moreover, because the class would, by definition, include only misclassified employees, there could be no adverse judgment that would bind class members. Deluhery's class thus is improper and cannot be certified.

### 2. The Members Of The Proposed Class Are Not Readily Identifiable.

Certification is also improper because it is impossible to ascertain which (if any) EDS employees fall within Deluhery's proposed class without engaging in individualized inquiries for each putative class member. "Class membership must be readily identifiable such that a court can determine who is in the class and bound by its ruling without engaging in numerous fact-intensive inquiries." *Bakalar v. Vavra*, 237 F.R.D. 59, 64 (S.D.N.Y. 2006); *In re: Fosamax Prod. Liab. Lit.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008) ("Rule 23 contains the additional, implicit requirement that an ascertainable class exists and has been properly defined.")

Deluhery's proposed class would consist of exempt EDS employees who had "primary duties of installing, maintaining and/or supporting computer software and/or hardware." He will be unable, however, to identify any written job role, job code or job family description (or any other corporate document) describing a position that lists such "primary duties." As a result, there is no

way to identify from corporate records which of the individuals in 3-series job codes fall within Deluhery's class description.  Moreover, by limiting the proposed class to employees whose **primary** duty is installation, support and maintenance, Deluhery recognizes that some 3-series positions involve these duties less than half of the time (or not at all).

This acknowledgment is an admission by Deluhery that his proposed class would require the Court to examine the particular duties performed by each of the putative class members.  For each individual, the Court would be required to determine whether his duties fall within Deluhery's "install/maintain/support" description and, if so, as required by California law (*see* Wage Order 4-2001(2)(N)), whether and on which days such duties consumed over 50% of the class member's work time (*i.e.*, his primary duty).  Thus, by its own terms, Deluhery's class definition fails.

IV.    <u>CONCLUSION</u>

For the reasons set forth above, EDS' motion should be granted.

Dated:  April 7, 2010                              Respectfully submitted,

                                                   BAKER & HOSTETLER LLP


                                                   By: <u>*Martin T. Wymer*</u>
                                                        Martin T. Wymer
                                                        Todd A. Dawson
                                                        3200 National City Center
                                                        1900 East Ninth Street
                                                        Cleveland, OH  44114-3485
                                                        (216) 621-0200

                                                        *Attorneys for Defendant*
                                                        *Electronic Data Systems Corporation*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 7, 2010, a true and correct copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

*Martin T. Wymer*
Martin T. Wymer
