# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**KELLEY CUNNINGHAM**, *et al.*,

      Plaintiffs,

      vs.

**ELECTRONIC DATA SYSTEMS CORP.**, *et al.*,

      Defendants.

JUDGE RICHARD J. HOLWELL

CASE NO. 1:06-CV-03530-RJH

---

**BRIAN STEAVENS**, *et al.*,

      Plaintiffs,

      vs.

**ELECTRONIC DATA SYSTEMS CORP.**,

      Defendant.

JUDGE RICHARD J. HOLWELL

CASE NO. 1:08-CV-10409-RJH

---

### MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION, COURT-AUTHORIZED NOTICE AND OTHER RELIEF PURSUANT TO SECTION 16(b) OF THE FAIR LABOR STANDARDS ACT

May 7, 2010

BAKER & HOSTETLER LLP

Martin T. Wymer
Todd A. Dawson
Michelle B. Anselmo
PNC Center
1900 East Ninth Street
Suite 3200
Cleveland, OH  44114-3482
Telephone: (216) 621-0200
Facsimile: (216) 696-0740

*Attorneys for Defendant*
*Electronic Data Systems Corporation*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................... 1

II.   COUNTER-STATEMENT OF FACTS .......................................................................... 1

    A.   Proposed Class Members Perform Widely Dissimilar Duties ........................... 2

        1.   Plaintiffs' Proposed Class A ................................................................ 2

        2.   Plaintiffs' Proposed Class B ................................................................. 6

        3.   Plaintiffs' Proposed Class C ............................................................... 10

    B.   EDS' Job Classifications Did Not Reflect Employees' Actual Duties ...................... 11

III.  PLAINTIFFS' NEW PROPOSED CLASSES WOULD BE UNMANAGEABLE
      AND ARE NOT PROPER FOR § 16(B) CERTIFICATION ............................................. 13

    A.   The Court Should Apply A Heightened Standard To Plaintiffs' Request For
        § 16(b) Certification ............................................................................................ 15

    B.   Section 16(b) Certification Would Require Numerous, Unmanageable Mini-
        Trials Concerning Multiple FLSA Overtime Exemptions ............................................ 18

    C.   Plaintiffs Fail To Make A Factual Showing Of A Common Unlawful Plan Or
        Policy Subject To Generalized Proof ................................................................... 27

IV.   CONCLUSION .............................................................................................................. 30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aguirre v. SBC Communs., Inc.*, 2006 U.S. Dist. LEXIS 22211 (S.D. Tex. Apr. 11, 2006) .................................................................................................................. 23

*Amendola v. Bristol-Myers Squib Co.*, 558 F. Supp. 2d 459 (S.D.N.Y. 2008) .............. 16, 18, 22, 26

*Armstrong v. Weichert Realtors*, 2006 U.S. Dist. LEXIS 31351 (D.N.J. May 19, 2006) ............... 14

*Bagwell v. Florida Broadband*, 385 F. Supp. 2d 1316 (S.D. Fla. 2005) ............................................ 19

*Bah v. Shoe Mania, Inc.*, 2009 U.S. Dist. LEXIS 40803 (S.D.N.Y. May 13, 2009) ..................... 30

*Barfield v. New York City Health & Hospitals Corp.*, 2005 U.S. Dist. LEXIS 28884 (S.D.N.Y. Nov. 17, 2005) ................................................................................................. 13, 23

*Baroni v. BellSouth Telecommunications, Inc.*, 2004 U.S. Dist. LEXIS 14403 (E.D. La. July 27, 2004) .............................................................................................................. 16

*Basco v. Wal-Mart Stores, Inc.*, 2004 U.S. Dist. LEXIS 12441 (E.D. La. July 1, 2004) .............................................................................................................. 17, 23, 27

*Berlowitz v. Nob Hill Masonic Mgt., Inc.*, 1996 U.S. Dist. LEXIS 22599 (N.D. Cal. Dec. 6, 1996) ................................................................................................................... 2

*Bobadilla v. MDRC*, 2005 U.S. Dist. LEXIS 18140 (S.D.N.Y. Aug. 23, 2005) ......................... 21

*Booth v. Electronic Data Systems*, 799 F. Supp. 1086 (D. Kan. 1992) ............................................ 19

*Castro v. Spice Place, Inc.*, 2009 U.S. Dist. LEXIS 7678 (S.D.N.Y. Jan. 29, 2009) ................................................................................................................. 13, 17, 23, 27

*Clarke v. JPMorgan Chase Bank*, 2010 U.S. Dist. LEXIS 33264 (S.D.N.Y. March 26, 2010) .............................................................................................................. 20, 21, 26

*Cwiak v. Flint Ink Corp.*, 186 F.R.D. 494 (N.D. Ill. 1999) ............................................................... 2

*Damassia v. Duane Reade, Inc.*, 2006 U.S. Dist. LEXIS 73090 (S.D.N.Y. Oct. 4, 2006) ...... 17, 24

*Diaz v. Electric Boutique*, 2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 13, 2005) ................................................................................................ 18, 23, 24, 26, 28

*EEOC v. MCI International, Inc.*, 829 F. Supp. 1438 (D.N.J. 1993) ............................................ 14

*England v. New Century Finance Corp.*, 370 F. Supp. 2d 504 (M.D. La. 2005) .............................. 16

*Evancho v. Sanofi-Aventis U.S. Inc.*, 2007 U.S. Dist. LEXIS 93215 (D.N.J. Dec. 18, 2007) ............................................................................................................... 22, 26

*Forney v. TTX Co.*, 2006 U.S. Dist. LEXIS 30092 (N.D. Ill. Apr. 7, 2006) ........................ 15, 29

*Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941 (W.D. Ark. 2003) ............................. 14, 27

*Galasso v. Eisman, Zucker, Klein & Ruttenberg*, 310 F. Supp. 2d 569 (S.D.N.Y. 2004) ...............21

*Gallender v. Empire Fire & Marine Insurance Co.*, 2007 U.S. Dist. LEXIS 7127 (S.D. Miss. Jan. 31, 2007) ........................................................................................................15

*Golden v. Merrill Lynch & Co.*, 2007 U.S. Dist. LEXIS 90106 (S.D.NY. Dec. 6, 2007) ............22

*Hampshire v. Port Arthur Ind. Sch. District*, 2006 U.S. Dist. LEXIS 88874 (E.D. Tex. Dec. 7, 2006) ........................................................................................................ 13, 23

*Harris v. FFE Transport Services*, 2006 U.S. Dist. LEXIS 51437 (N.D. Tex. May 15, 2006) ........................................................................................................................16

*Heffelfinger v. Electric Data System Corp.*, 580 F. Supp. 2d 933 (C.D. Cal. 2008) ................... *passim*

*Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265 (M.D. Ala. 2004) ...............................................23

*In re Initial Public Offering Sec. Litigation*, 471 F.3d 24 (2d Cir. 2006) ...............................26

*Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567 (E.D. La. 2008) ................................. 27, 30

*King v. West Corp.*, 2006 U.S. Dist. LEXIS 3926 (D. Neb. Jan. 13, 2006) .......................... 25, 29

*Koppinger v. America Interiors, Inc.*, 295 F. Supp. 2d 797 (N.D. Ohio 2003) ...............................20

*Levinson v. Primedia Inc.*, 2003 U.S. Dist. LEXIS 20010 (S.D.N.Y. Nov. 6, 2003) ............. 13, 23

*Lewis v. Wells Fargo*, 669 F. Supp. 2d 1124 (N.D. Cal. 2009) .................................. 25, 26, 30

*Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D. N.J. 1987) ..............................................................15

*Malloy v. Richard Fleischman & Associates*, 2009 U.S. Dist. LEXIS 51790 (S.D.N.Y. June 3, 2009) ..........................................................................................................25

*Mike v. Safeco Insurance Co. of America*, 274 F. Supp. 2d 216 (D. Conn. 2003) ...........................22

*Morales v. Plantworks, Inc.*, 2006 U.S. Dist. LEXIS 4267 (S.D.N.Y. Feb. 1, 2006) ...................23

*Morisky v. Public Svc. Electric & Gas*, 111 F. Supp. 2d 493 (D.N.J. 2000) ........................... 14, 22

*Pacheco v. Boar's Head Provisions Co.*, 2009 U.S. Dist. LEXIS 112335 (W.D. Mich. Dec. 3, 2009) ........................................................................................................16

*Pfaahler v. Consultants for Architects*, 2000 U.S. Dist. LEXIS 1772 (N.D. Ill. Feb. 8, 2000) ........................................................................................................................29

*Pfohl v. Farmers Insurance Group*, 2004 U.S. Dist. LEXIS 6447 (C.D. Cal. March 1, 2004) ............................................................................................................29

*Piscione v. Ernst & Young*, 171 F.3d 527 (7th Cir. 1999) ...............................................19

*Prizmic v. Armour, Inc.*, 2006 U.S. Dist. LEXIS 42627 (E.D.N.Y. June 12, 2006) ....................14

*Ray v. Motel 6 Op. LP*, 1996 U.S. Dist. LEXIS 22565 (D. Minn. Feb. 15, 1996) ....................14

*Reich v. Homier Distributing Co.*, 362 F. Supp. 2d 1009 (N.D. Ind. 2005) ...........................22, 23

*Saleen v. Waste Management*, 2009 U.S. Dist. LEXIS 49891 (D. Minn. June 15, 2009) ..............14

*Torres v. Gristede's Op. Corp.*, 2006 U.S. Dist. LEXIS 74039 (S.D.N.Y.  Sept. 28, 2006) ..........17

*Toure v. Central Parking System*, 2007 U.S. Dist. LEXIS 74056 (S.D.N.Y. Sept. 28, 2007) ...........................................................................................................17

*Vinole v. Countrywide Home Loans, Inc.*, 246 F.R.D. 637 (S.D. Cal. 2007), *aff'd* 571 F.3d 935 (9th Cir. 2009) ....................................................................................29

*Young v. Cerner Corp.*, 503 F.Supp.2d 1226, 1231 (W.D. Mo. 2007) .................. 18, 24, 25, 26, 29

*Young v. Cerner Corp.*, 503 F.Supp.2d 1226, 1231 (W.D. Mo. 2007) .................. 18, 24, 25, 26, 29

## DOCKETED CASES

*Eng-Hatcher v. Sprint Nextel Corp.*, S.D.N.Y. Case No. 07 Civ. 7350 (BSJ) ................................23

## FEDERAL STATUTES

29 C.F.R. § 541.100 ..........................................................................................22, 30

29 C.F.R. § 541.201(b) ........................................................................................19, 30

29 C.F.R. § 541.203(c) ........................................................................................19, 30

29 C.F.R. §§ 541.300-304 ..................................................................................20, 21, 30

29 C.F.R. § 541.402 ........................................................................................19, 20, 30

29 C.F.R. § 541.601 (2009) ..........................................................................................22

29 C.F.R. § 541.700(a) ................................................................................................18

29 U.S.C. § 216(b) ....................................................................................................13

29 U.S.C. § 541.300 ..................................................................................................21

## I.  <u>INTRODUCTION</u>

Plaintiffs claim they were misclassified as exempt from overtime by their employer, Electronic Data Systems Corporation (EDS), and seek collective action certification of three proposed classes under § 16(b) of the Fair Labor Standards Act (FLSA).  They seek to include in these classes 19,500 EDS employees who performed widely dissimilar duties for a diverse array of customers in myriad working environments.  Plaintiffs provide no rational justification for certifying the classes they propose, nor can they show how it will foster material proof common to each class member as to whether he was misclassified as exempt under the FLSA.

EDS' business was exclusively customer-driven.  Because EDS' 900 global customers were involved in virtually every type of business and all levels of government throughout the world, their technology needs were unique and diverse.  To meet these needs, EDS provided a broad menu of information technology ("IT") services as vast, diverse and dynamic as the global economy itself.  This resulted in incredible variations in the actual duties performed by EDS employees, encompassing thousands of different combinations of dissimilar roles and responsibilities.  Consequently, a determination of whether members of the putative classes were misclassified under the FLSA can only be made through individualized inquiries focusing on the particular duties performed by each particular employee, as Plaintiffs have markedly different job duties from one another and the broadly divergent members of the proposed class.  The necessity of such particularized inquiries renders this case wholly unmanageable as a collective action because the question of whether the widely dissimilar proposed class members were misclassified cannot be fairly answered with representative proof.  Therefore, because Plaintiffs cannot make the required showing that they and the employees they seek to represent are similarly situated, § 16(b) certification must be denied.

## II.  <u>COUNTER-STATEMENT OF FACTS</u>

EDS was a global leader in IT consulting and outsourcing.  (Ex. 47 ¶ 3).  Its customer base consisted of more than 900 diverse companies and governmental entities, including the United

States Department of Defense, American Airlines, Bank of America, and General Motors.   (*Id.*).
EDS provided a wide array of services to these customers that included database administration,
strategic IT project planning and coordination, computer network design, system and application
development, and dozens of other solutions for customers' complex and unique business problems.
(*See* Ex. 40). [1]  Not surprisingly, EDS employees' actual job duties were dictated by the disparate
needs of EDS' 900 customers, not their corporate job classifications, and naturally varied greatly
from customer to customer.  (Ex. 44 ¶¶ 16-23; *see also, e.g.*, Ex. 49 ¶ 7; Ex. 50 ¶ 10; Ex. 32 ¶ 15; Ex.
46 ¶¶ 26-29).   Indeed, Plaintiff Schwab equated the differences in supporting two separate
customers to a comparison of "apples and oranges," and agreed that "supporting different
customers means different duties."  (Ex. 9, Schwab Tr. 38-39).

### A.    Proposed Class Members Perform Widely Dissimilar Duties.

In their Amended Complaints, Plaintiffs sought to represent virtually all exempt EDS em-
ployees performing computer-related work.  In moving for § 16(b) certification, Plaintiffs purport to
narrow this class definition by randomly sweeping into three proposed classes over 19,500 employ-
ees who performed an immeasurable variety of job duties.  Almost 2,400 of these employees worked
at home, with the rest working at 987 locations in all 50 states.  (Ex. 47 ¶¶ 14, 17-18).  The stunning
overbreadth of these proposed classes is fatal to § 16(b) certification. [2]

### 1.    Plaintiffs' Proposed Class A.

Plaintiffs' Proposed Class A is a hodgepodge of 1,500 employees with significantly dissimilar
duties in three unrelated technology areas:  Systems Administration, Telecommunications, and Ser-
vice Center Support.  (Ex. 47 ¶ 12).   For instance, proposed class members on EDS' Situation

---

[1]  All exhibits are contained in EDS' *Declaration Of Martin T. Wymer, Esq.*, filed herewith.

[2]  For the reasons set forth in its April 10, 2010 letter to the Court, EDS submits that Plaintiffs' new
proposed class definitions should not be considered because they did not properly amend their
Complaint.  *See Berlowitz v. Nob Hill Masonic Mgt., Inc.*, 1996 U.S. Dist. LEXIS 22599 at *6 (N.D.
Cal. Dec. 6, 1996) (court will "not consider certification of the class beyond the definition pro-
vided in the complaint"); *Cwiak v. Flint Ink Corp.*, 186 F.R.D. 494, 497 (N.D. Ill. 1999).

Management Team were called upon in emergency outage situations to create recovery plans, iden-

tify and convene *ad hoc* recovery teams, and manage recovery processes until service was restored,

while those on the DOD account "manag[ed] other team members by coordinating and directing

their work, determining and meeting schedules, deciding when to refer an issue to [a] superior or to

a vendor, dealing with [customer] representatives, and providing [escalated] support." *Heffelfinger v.*

*Elec. Data Sys. Corp.*, 580 F. Supp. 2d 933, 938-47 (C.D. Cal. 2008); (Ex. 54 ¶¶ 12, 13).  Conversely,

proposed class members on EDS' NMCI account worked in *queue management* roles, interpreting

EDS' obligations under various customer agreements and interviewing and supervising nonexempt

employees.  (Ex. 50 ¶ 13; Ex. 55 ¶¶ 13-16). [3]

Plaintiffs in this proposed class were equally dissimilar.  For example, Plaintiff Deluhery was

the only employee on EDS' City of Anaheim account in a *computer security administrator* role.  He man-

aged computer security policies and technologies, advised the City regarding security projects and

concerns, assessed production and data security technologies (including intrusion detection systems),

created and tested security applications for wireless computer access, and researched emerging

security trends and technologies to recommend new measures to the City.  Deluhery holds numer-

ous certifications reflecting his prowess in security technology, including CISA (Certified Informa-

tion Security Auditor) and CISP (Certified Information Security Practitioner).  He worked under

minimal supervision, evidenced by the voluminous amounts of pornographic images he stored on

the work computer issued to him by the City, which were revealed during discovery and led to his

termination.  (Ex. 6, Deluhery Tr. 29, 40-43, 134-42, 208-14; Exs. 21, 22, 24 (at EDS 14309 and

EDS 33783); Ex. 26; Ex. 48 ¶¶ 5-9).

Plaintiff Goldberg, on the other hand, testified that she performed duties that bear no resem-

blance to those Deluhery performed.  According to Goldberg, her duties at a GM plant in Lansing,

---

[3]  *See also* Exhibits 50 through 60, declarations from a sampling of EDS leaders describing the widely
diverse day-to-day duties of many additional employees included in this proposed class.

Michigan consisted merely of installing, moving and changing personal computers for GM end users, and that she worked under "constant" supervision, receiving daily work assignments from her manager. She also did not possess security administration certifications as Deluhery did. Indeed, Goldberg's duties were so routine that EDS voluntarily reclassified her to a nonexempt position in May 2007. (Pls. Br. at 8 n. 7; Ex. 11, Goldberg Tr. 26, 35-38, 145; Ex. 45 ¶ 14).

In contrast, Plaintiff Confar did not work at an auto plant or at City Hall, and was not even involved with computer networks or hardware. Instead, he worked from his home in Washington in a *telecommunications network specialist* role, providing EDS customers with new and/or improved telecommunications capabilities. Unlike Deluhery, Goldberg and other proposed class members, Confar provided services for hundreds of different clients rather than a single account. Because he worked from home, Confar determined his projects and priorities each day. His wide-ranging duties included coordinating an upgrade of thousands of telecommunications components, working on telecommunications network designs, writing component and configuration command structures, approving/rejecting proposed telecommunications network changes, investigating system failures and testing for potential causes, and recommending network upgrades based on his industry knowledge. (Ex. 5, Confar Tr. 23, 30-32, 41-53, 60-64, 81-82, 87, 116-25, 131-34).

Conversely, Plaintiff Sanetz performed work of a completely different character, involving physics and engineering concepts. He also did not have network security responsibilities, constant customer contact or a client worksite assignment like Deluhery, nor did he work from home like Confar; instead, he worked at EDS' data center in Charlotte, designing computer mainframe environments from the ground up. His "primary duty was hardware planning and installation, including all aspects of the facility for proper power, space and cooling for server and mainframe installations," and "provid[ing] channel configurations and connectivity for all mainframe and server equipment." Sanetz also was a recognized *subject matter expert* on EDS' AutoCAD application suite that described power, space and cooling requirements for data center infrastructure, which he used in

planning new server environments.  He needed 2 to 3 years to become proficient in this complex application.  (Ex. 12, Sanetz Tr. 75, 120-21, 127, 176-78).  Plaintiffs McCann, Conklin and Duley (who were on *the same* Charlotte data center team as Sanetz), however, all claim they performed low-level duties such as repairing hardware failures and unpacking and physically installing servers into racks, duties bearing little relation to those performed by Sanetz and other proposed class members.  (Pls. Br. 9, n. 9; Ex. 10, Conklin Tr. 30-33; Ex. 13, Duley Tr. 61-64; Ex. 14, McCann Tr. 45-49).

In further contrast, Plaintiff Brousseau was the senior administrator at a GM plant in Massena, New York, managing projects, developing documentation, providing technical coaching and mentoring, mitigating service delivery costs and risks, and optimizing hardware, software, and operating systems.  He also was a permanent voting member of the Change Advisory Board, evaluating and authorizing changes to GM's IT environment.  Brousseau possesses a Cisco Certified Network Associate ("CCNA") certification, which requires training, examination and periodic recertification in a curriculum involving various network protocols.  (Ex. 32).  As the site lead, he performed non-routine duties (based on the plant's unique environment) with limited supervision and independent decision-making authority.  Unlike Deluhery, however, Brousseau does not possess network security certifications or work with wireless networks.  (Ex. 4, Brousseau Tr. 8, 16-18, 26-33, 77-89, 119-30, 144-45, 153-54, 183-84; Ex. 36; Ex. 41; Ex. 43).

Individual proposed class members also describe much different duties than those described by Plaintiffs.  For instance, Dean McGeachy worked in *operations transition migration* and *project manager* roles, designing and overseeing project plans to assimilate new customers' IT functions into EDS' mainframe and midrange environments.  He developed project plans based on each customer's unique needs and IT environment, and assigned teams to support those projects.  He also regularly applied "systems analysis techniques and procedures, including consulting with the client's staff, to determine hardware, software, and system functional specifications so that the migration of these

systems to EDS computers [was] efficiently accomplished."  He also set his own work hours and worked from home whenever he felt it was appropriate.  (Ex. 84, McGeachy Decl.).

Conversely, proposed class member Jeff Elkoury worked in a *global service delivery leader* role, managing EDS' relationship with ConvaTec (a medical care products manufacturer).  Elkoury had 6 employees reporting to him, who oversaw approximately 50 to 75 service desk agents in locations around the world.  He directed the day-to-day work of these employees and jointly evaluated their work performance.  He also negotiated and administered EDS' contracts with ConvaTec and EDS subcontractors, and had the authority to renegotiate these agreements as he thought necessary.  Because ConvaTec was a relatively new EDS customer, Elkoury also was responsible for establishing a new account business model and processes.  (Ex. 83, Elkoury Decl.).

### 2.   **Plaintiffs' Proposed Class B.**

Plaintiffs' mammoth Proposed Class B encompasses over 17,500 individuals from the widely dissimilar Information and Infrastructure IT disciplines.  (Ex. 47 ¶ 13).  Some of these individuals performed extraordinarily complex technical duties, such as employees working in *applications developer* roles who designed, developed, created and tested business software solutions to meet the needs of numerous customers.  (Ex. 61 ¶¶ 19-27).  Their projects were complicated and unique, requiring analysis of the customer's existing infrastructure and the code, protocols and programs running on that infrastructure; research regarding the optimal programming language to employ (*e.g.*, JAVA, .NET, COBOL, PL 1, Visual Basic, *etc.*); and understanding the customer's existing servers, databases and applications that would be integrated into the end product.  (*Id.*).

Other proposed class members applied technical IT knowledge as an adjunct to substantive expertise in the customer's particular field.  For example, EDS employees on the Centers for Disease Control account developed computer applications that created geospatial depictions of predicted disease outbreaks and vaccination rates based on their significant knowledge of disease epidemics and containment.  One team member even traveled internationally with CDC officials to

conduct seminars regarding prevention and containment of tuberculosis.  These individuals all were required to have a bachelor's degree at a minimum, and many held doctorates.  (Ex. 62 ¶¶ 13-15).

Still other members of this proposed class had supervisory responsibilities in lieu of (or in addition to) technical responsibilities.  For example, an employee on EDS' ExcellerateHRO account managed an entire facility with authority to hire, fire, promote, discipline and direct all 60 EDS employees at that location.  Putative class members who reported to him had the same authority over their own team members.  (Ex. 65 ¶¶ 1, 8, 24).[4]

The duties performed by Plaintiffs in this proposed class also varied significantly.  For instance, Plaintiff Ahlberg was the "go-to guy" for the computer network at GM's plant in Saginaw Bay, Michigan.  While there were guidelines for his *network analyst* role, they could not be understood without technical knowledge, and Ahlberg "use[d] [his] own judgment" to deviate from them.  He also served as a *team lead*, directing work, approving time off requests, and conducting performance reviews.  He has a CCNA certification, but conceded he was not qualified to perform a number of the roles held by other employees in his job code, including work requiring a Microsoft Certified Systems Engineer certification.  (Ex. 1, Ahlberg Tr. 7-8, 24, 29, 35, 42-43, 66-75, 87-91, 98).

In contrast, Plaintiff Brignola possessed the MCSE certification Ahlberg lacked.  Brignola described himself as the "senior" or "lead engineer" performing the most "complex," "high level" work at his office, assigning work to other engineers and "supervis[ing] four levels of support staff." He prepared budget estimates, managed projects, and developed technical documentation.  Unlike Ahlberg, Brignola's "customer" was EDS, not an external customer.  (Ex. 3, Brignola Tr. 6, 8, 20-22, 35, 37, 123-27, 130-31, 137-38, 145).

Plaintiff Fugitt, on the other hand, described a role bearing no resemblance to those of Brignola or Ahlberg.  While Brignola performed "complex" technical work and had significant bud-

---

[4]  *See also* Exhibits 61 through 80, declarations from a sampling of EDS leaders describing the widely diverse day-to-day duties of many additional employees included in this proposed class.

getary and development responsibilities, Fugitt "had nothing to do with budget[ing]" or development work and claims he immediately escalated any "complex" problems to more technical employees. He also did not work with software applications and was never a *team lead*. Instead, he claims he merely made changes to the computer network at a GM plant and monitored its overall health. (Ex. 15, Fugitt Tr. 17-19, 28, 35-36, 82, 112, 114, 158-61, 190-91).

Conversely, Plaintiff Brown worked from his home in an *operations readiness manager* role on EDS' Nextel account, "leading a team of 10 second level technical specialist[s] in administering, optimizing, testing, analyzing and troubleshooting internal LAN/WAN infrastructure consisting of more than 1,000 network devices." He also performed root cause analysis to solve various *infrastructure* problems. Brown has an Industrial Technology degree, a Master's in Network Security, and numerous technical certifications, including a CCSPA, NNA, CCDA, CCNP and CCNA. The CCDA is a full step above the CCNA, focusing on campus, data center, security, voice, and wireless network design. The CCNP is even more advanced, requiring "the ability to plan, implement, verify and troubleshoot local and wide-area enterprise networks and work collaboratively with specialists on advanced security, voice, wireless and video solutions." (Ex. 16, Brown Tr. 8-11, 16-17, 50-51, 176-77, 181-83, 187).

Unlike Brown, Plaintiff Hightower had nothing to do with infrastructure (such as servers or computer networks)—instead, she worked on EDS' AT&T account in Alabama as a subject matter expert and/or *tech lead* for various complex *software* applications, including UNE319 and TNG. Hightower was viewed as the "go-to" person for EDS employees on the account, and was instrumental in the successful implementation of several midrange software applications. She also acted in a *customer liaison* role and "[was] often sought by the customer and outside support teams to provide consulting on various projects." (Ex. 17, Hightower Tr. 75, 79, 99, 106-8 198-99; Ex. 28; Ex. 29, p. 7). In fact, Plaintiff Ham referred to her co-worker Hightower as "the guru [of] midrange" and explained how she trained EDS employees on new software. (Ex. 18, Ham Tr. 35-37, 55-56).

Hightower also interviewed applicants for potential employment in her group.  (Ex. 17 at 152; Ex. 27, p. 9).  She has an MBA and is a Certified Novell Administrator.  (Ex. 17 at 8-10).

Plaintiff Geary had yet another different and unique role as the Global Application Owner for GM's Maximo software program (used by 77,000 GM employees) and the world-wide *subject matter expert* for the entire Maximo function.  In this role, she created a "Maximo action sustain team," interviewed candidates for assignment to her team, had "lead responsibilities" over team members who performed "high level technical work" that required them to "apply systems analysis techniques," provided "input on complicated business issues" to EDS management, and managed global projects.  She also possesses a Master's degrees in Business Administration and is certified as a Professional Project Manager.  (Ex. 7, Geary Tr. 10, 35, 39, 59-60, 69, 80, 112, 154-55, 244-45).

This wide dissimilarity in job duties and responsibilities is further described by proposed class members who have not joined as plaintiffs.  For instance, Robin Briggs worked in a *team lead* role, consulting with customers to identify their business needs, and developing application capabilities to meet those needs.  She also supervised, assigned and evaluated EDS engineers, and was responsible for the computer programs they developed.  She led team meetings, approved time off requests, and provided guidance and mentoring.  (Ex. 86, Briggs Decl.).  By contrast, Steve Mann held a *Citrix engineer* role for EDS' accounts with Xerox and San Diego County, designing Citrix computer systems to optimize data access and application performance on customer computer networks.  He designed these systems based on numerous variables, including the customer's IT environment, the number of network users, and network traffic patterns that would allow many different databases and servers to communicate most effectively.  (Ex. 85, Mann Decl.).

Mitchell Stevens' duties stand in even greater contrast to other proposed Class B members.  As a *senior forensic engineer* in EDS' Investigative Support Services, Stevens worked closely with NCIS (Naval Criminal Investigation Services), applying forensic strategies to investigate possible security breaches on NMCI's computer network.  He also supervised two employees responsible for "classi-

fied spillage" remediation, i.e., identifying and eliminating classified information from unauthorized desktop machines. (Ex. 87). *See also* Exs. 88-93 (declarations of other proposed class members describing their unique job duties).

### 3.     Plaintiffs' Proposed Class C.

The members of Plaintiffs' Proposed Class C (encompassing employees assigned to four separate job codes in the Information Security family) likewise performed duties that varied considerably. For instance, an employee supported the Federal Reserve Bank in a *business continuity program manager* role, managing the Bank's efforts to insure availability of critical business functions to its customers, regulators, and other entities, and training both EDS and customer employees on compliance and security issues. (Ex. 81 ¶ 18).

Conversely, a proposed class member on EDS' Medicare and Medicaid Services account served in *systems security officer* and *project manager* roles, leading preparations on behalf of the customer for annual security audits, negotiating on behalf of the customer with government security auditors concerning the audit's scope, coordinating remediation of audit findings, and advising the customer on various security and disaster recovery issues. She also had supervisory authority in assigning work, managing schedules, and providing input for performance assessments and career development for employees. (Ex. 80 ¶¶ 13-17).

In contrast to these high-level duties, Plaintiff Char worked on EDS' NMCI account in Hawaii in a role he described simply as "look[ing] at monitors to see the network's security." He also updated anti-virus programs and reported suspicious network activity. Unlike other proposed class members, he did not perform team lead duties, handle escalations, engage in strategic planning, or make customer recommendations. (Ex. 19, Char Tr. 40-41, 43-48, 60; Ex. 39). In fact, EDS voluntarily reclassified Char into a nonexempt position in late 2007 after learning of the routine nature of his duties. (Ex. 45 ¶ 21).

Conversely Proposed Class C member Gregory Hoare describes duties bearing no resemblance to those Char claims to have performed. Hoare held a *compliance coordinator* role and was the *subject matter expert* for the Network Automation Systems ("NAS") application. The NAS program audited various security features across customer computer networks and reported the findings. Hoare analyzed these findings, identified those that were false positives, prioritized the remaining findings according to his view of their significance, and then coordinated with application owners for the networks to identify and implement the appropriate corrections to bring the system into compliance. (Ex. 94).

### B.   EDS' Job Classifications Did Not Reflect Employees' Actual Duties.

These wide variations in actual duties reflect the generalized nature of EDS' job classifications and the discretion of each manager to assign work to meet customer needs. At the highest level, EDS divided its workforce of 130,000 employees into six different "job series." (Ex. 44 ¶ 5). Each job series was roughly divided into broad "job families." Several steps removed from employees' actual duties, each job family described a possible career progression in a general IT area (*i.e.*, Infrastructure, Telecommunications, *etc.*). (Ex. 44 ¶¶ 7-9). Job families, in turn, were broken into three to five different "job codes," which generally described the spectrum of work in a job family's IT area. (*Id.*) As EDS witness Mike Evans explained, the higher job codes in a job family were intended to reflect more complex work on this spectrum requiring greater expertise:[5]

> Q.   (*By Plaintiff's Counsel*) So you mean to tell me that if I -- if I showed you a piece of paper that -- that listed the job families that -- that the people with the lowest -- on the lowest rung of the ladder wouldn't have similar duties and responsibilities of people on the -- with the higher level -- of higher rungs of that job family?

---

[5] Plaintiffs admit on page 5 of their Brief that successive job codes were intended to cover "more complex" work "requiring greater knowledge and expertise" at each level, yet later dismiss this increasing complexity on page 8 as "non-material" and irrelevant. Not surprisingly, they offer no evidentiary support or explanation for the latter pronouncement.

A.    (*By Mr. Evans*)  That's correct.  They might be in the same industry, but the person on the lower rung might be doing the lowest level type of work where the person on the highest rung is designing software.  (Ex. 20, Evans Tr. 60-61).[6]

Descriptions for each job code contained a menu of possible duties, with the intention that most employees' duties would be comprised of unique subsets from these menus, depending on customer needs.  (Ex. 44 ¶¶ 22, 23).  Job codes therefore encompassed hundreds of different job roles.  (*Id.* ¶¶ 9, 22-23).  As Evans testified, "if you had a hundred different infrastructure analysts and took them out of random and put them in our office, you would have a hundred different functions, be doing a hundred different things."[7]  (Ex. 20 at 37).

This broad structure was theoretical, developed at the corporate level.  (Ex. 20 at 32-33).  As Evans explained, the job codes did not "in reality" reflect employees' actual duties because "customers require different type[s] of things, just a variety of issues."  (*Id.*).  Even Plaintiffs discount the significance of EDS' job codes, testifying that the descriptions did not accurately describe day-to-day duties.  (Ex. 15 at 34; *see also*, *e.g.*, Ex. 9 at 162-73; Ex. 2 at 92-95; Ex. 16 at 204-19; Ex. 13 at 91-94).[8]

Instead, actual duties depended on the needs of each of EDS' 900 customers.  As Plaintiffs recognize (Pls. Br. 5), EDS' thousands of front-line supervisors decided, on an *ad hoc* basis, how to

---

[6]  Plaintiffs cite page 86 of Evans' deposition for the contrary proposition that all members of a job family performed the same duties.  (Pls. Br. 4).  That portion of Evans' transcript contains no such testimony and he denied this assertion when asked directly.  (Ex. 20 at 60-61).

[7]  Again, Plaintiffs curiously cite Evans' deposition for the contrary position, *i.e.* that all employees in a job code performed similar day-to-day duties.  (Pls. Br. 4).  Evans, however, insisted repeatedly that job codes were **intended** to describe positions with similar duties, but that the diversity of customer needs resulted in significant departures from this intention in actual practice.  (*See* Ex. 20 at 32-33, 35-36, 38, 41, 46-47, 61, 77, 84, 91-92, 180-81).

[8]  To further illustrate this point, Plaintiff Deluhery, who as the *computer security administrator* for the City of Anaheim managed their computer security policies, was assigned a system administrator-advanced job code and hence included in Proposed Class A.  Proposed Class B member Mitchell Stevens, who worked as a *senior forensic engineer* investigating potential network security breaches on the NMCI account, was assigned an information specialist job code.  Thus, even though both Deluhery and Stevens had roles (though distinct from each other) that relate to the general information security area, they were not assigned job codes in the Information Security family.  They also are not included in Plaintiffs' Proposed Class C, given Plaintiffs' mechanical reliance on EDS job classifications in defining their proposed classes.

12

assign job duties and roles in the field to best meet customer needs.  (Ex. 44 ¶¶ 16-24).  Though some of the more common job roles were identified (but not defined) in corporate documents (*i.e.,* job family "matrices"), managers developed job roles and/or job role combinations for their teams as they thought necessary, regardless of whether such roles were identified elsewhere.[9]  (Ex. 46 ¶¶ 13-24, 31-33).  Hence, the hundreds of *job roles* performed by EDS employees in each job family came closer to describing their actual duties than any other designation.

In short, each of Plaintiffs' proposed classes includes employees in multiple job codes who performed hundreds of different roles for hundreds of different customers with thousands of different combinations of actual job duties.  These classes are not proper for § 16(b) certification.

## III.   PLAINTIFFS' NEW PROPOSED CLASSES WOULD BE UNMANAGEABLE AND ARE NOT PROPER FOR § 16(b) CERTIFICATION.

Section 16(b) of the FLSA permits the overtime claims of multiple, consenting plaintiffs to be joined together in a "collective action," but only if they prove that they all are "similarly situated," which is defined as proof that they "together were victims of a common policy or plan that violated the law."  *Castro v. Spice Place, Inc.,* 2009 U.S. Dist. LEXIS 7678 at *5 (S.D.N.Y. Jan. 29, 2009); 29 U.S.C. § 216(b).  Plaintiffs must prove this element through a **factual** showing (not simply allegations) that applies to **all** proposed class members.  *See, e.g., Levinson v. Primedia Inc.,* 2003 U.S. Dist. LEXIS 20010 at *4 (S.D.N.Y. Nov. 6, 2003); *Barfield v. New York City Health & Hosps. Corp.,* 2005 U.S. Dist. LEXIS 28884 at *3 (S.D.N.Y. Nov. 17, 2005); *Hampshire v. Port Arthur Ind. Sch. Dist.,* 2006 U.S. Dist. LEXIS 88874 at *13-15 (E.D. Tex. Dec. 7, 2006).  If § 16(b) certification is granted, the court may order notice to be directed to other similarly situated individuals to inform them they may

---

[9]  In yet another mischaracterization, Plaintiffs baldly assert that all employees within a job family performed all the job roles listed in the matrices.  (Pls. Br. 8, 9, 11, 12).  Undisputed evidence demonstrates, however, that the job family matrices set forth only the most common job roles on a very general level, that there was no common definition for these roles, and that employees did not perform all of the dozens of job roles listed in each matrix.  Instead, they performed one or two of the listed job roles or, in many cases, roles that were not included in the matrix but were created by their managers to meet unique customer needs.  (Ex. 46 ¶¶ 14-24, 31-33).

"opt-in" to the suit.  Because such notices may provoke and/or expand litigation, federal courts emphasize that their issuance should not be granted lightly.  *See, e.g., Saleen v. Waste Mgmt.*, 2009 U.S. Dist. LEXIS 49891 at *26 (D. Minn. June 15, 2009) ("[I]t is incumbent on a court at the conditional-certification stage to review all the evidence before it to determine whether it should facilitate notice and thereby expand the scope of litigation"); *Prizmic v. Armour, Inc.*, 2006 U.S. Dist. LEXIS 42627 at *7 (E.D.N.Y. June 12, 2006); *Armstrong v. Weichert Realtors*, 2006 U.S. Dist. LEXIS 31351 at *5 (D.N.J. May 19, 2006).

In this case, § 16(b) certification and notice are not warranted.  Plaintiffs' proposed classes include employees in a multitude of different roles with duties that varied immeasurably.  Plaintiffs provide no rational basis for this grouping, nor do they explain how it will foster material proof common to the class members.  Indeed, determining whether each proposed class member is exempt (*i.e.,* whether his primary duties involved exempt work) will require an individual, fact-specific analysis of the job duties he actually performed.  Thus, each of the thousands of potential plaintiffs will have to prove his own claim through a separate mini-trial, which will be won or lost based on evidence unique to that particular employee.  Congress did not intend the § 16(b) collective action mechanism to apply in this fashion, which would eviscerate any judicial efficiency a collective action might provide.  *See Morisky v. Pub. Svc. Elec. & Gas*, 111 F. Supp. 2d 493, 498-99 (D.N.J. 2000) (because evaluation of claims would have to be made on an employee-by-employee basis, "litigating this case as a collective action would be anything but efficient"); *EEOC v. MCI Int'l, Inc.*, 829 F. Supp. 1438, 1445-46 (D.N.J. 1993) (judicial efficiency not served by grouping "a lot of individual people with specific grievances" together, as it quickly becomes "a monster that no one can deal with"); *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945-46 (W.D. Ark. 2003).  *See also Ray v. Motel 6 Op. LP*, 1996 U.S. Dist. LEXIS 22565 at *12 (D. Minn. Feb. 15, 1996) (court should deny notice unless plaintiff can demonstrate that the collective action will be manageable).

**A.**   **The Court Should Apply A Heightened Standard To Plaintiffs' Request For § 16(b) Certification.**

In determining motions for § 16(b) certification, many courts adopt the approach first articulated in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D. N.J. 1987).   Under that analytical framework, when certification is raised at the inception of the case, the similarly situated inquiry is conducted under a somewhat lenient standard and revisited after discovery.   Where certification is raised later in the case and an adequate evidentiary record exists, on the other hand, the *Lusardi* analysis calls for a much more demanding standard of proof under which certification "is rarely granted."   *Gallender v. Empire Fire & Marine Ins. Co.*, 2007 U.S. Dist. LEXIS 7127 at *5 (S.D. Miss. Jan. 31, 2007); *see also Forney v. TTX Co.*, 2006 U.S. Dist. LEXIS 30092 at *5 (N.D. Ill. Apr. 7, 2006) ("[P]laintiffs must overcome a stringent evidentiary hurdle of demonstrating they are in fact similarly situated").

Plaintiffs urge the Court to utilize *Lusardi*'s lenient inception standard here even though substantial discovery has been conducted by the parties, and Plaintiffs rely on that discovery in requesting certification.   They further insist that considerations of judicial efficiency excuse them from all but the most minimal burden of establishing that § 16(b) certification is warranted.   Plaintiffs never explain, however, why a lower standard conceivably would be justified here or how ignoring the evidence would promote judicial efficiency.   Indeed, conditional certification of this case would create the antithesis of judicial efficiency.

Plaintiffs initially defined their proposed classes in the broadest terms possible, including every exempt EDS employee in the United States.   (DE 1 ¶ 7.)   They subsequently amended their definition to cover approximately 32,000 employees in EDS' Professional "3-series."   (*Cunn.* DE 72 at ¶ 1; *Ste.* DE 32 ¶ 1).   Rather than simply moving for certification under the lenient *Lusardi* inception standard, Plaintiffs elected to conduct wide-ranging discovery on their broadly defined class. In total, they served 230 interrogatories, nearly 350 document production requests, 30 topics for Rule 30(b)(6) examination and 6 deposition notices.   (Ex. 47 ¶ 5).   EDS agreed to first phase certification discovery, and ultimately produced more than **one million pages of documents** and a

database containing information on 50,000 employees, conducted 28 depositions, and designated a Rule 30(b)(6) deponent.  (*Id.* ¶¶ 6-7).  EDS further agreed to multiple extensions of the discovery period, which ultimately stretched discovery from 7 months to a ***full year***.  (DE 107, 120, 125).  After EDS produced virtually every piece of information requested, Plaintiffs' counsel ignored EDS' offer to designate corporate witnesses for the remainder of Plaintiffs' Rule 30(b)(6) topics and cancelled four additional depositions they had noticed, stating they had "sufficient information" to move for certification.  (Ex. 25; Ex. 30).

Notably, Plaintiffs now propose three new classes they characterize as more "focused," "resulting from the discovery that was undertaken."  (Pls. Br. at 3).  Thus, by their own admission, Plaintiffs have already obtained that which the lenient standard is intended to confer—the opportunity to conduct discovery to determine, based on the evidence, whether a proper class may exist. Yet, they simultaneously insist that they should be held to the lowest possible § 16(b) standard.

This argument is without foundation.  Once an adequate factual record pertaining to § 16(b) certification has been developed through discovery, courts routinely recognize that the inception standard is inapplicable even in regard to first phase certification motions.  For instance, in *Amendola v. Bristol-Myers Squib Co.,* 558 F. Supp. 2d 459, 467 (S.D.N.Y. 2008), Judge Cote applied a heightened level of scrutiny and denied § 16(b) certification based on evidence revealed in just five depositions and 6,000 documents produced by the defendant.  *See also Harris v. FFE Transp. Servs.*, 2006 U.S. Dist. LEXIS 51437 (N.D. Tex. May 15, 2006) (heightened standard applied to § 16(b) certification motion after parties had seven months to conduct discovery); *Pacheco v. Boar's Head Provisions Co.*, 2009 U.S. Dist. LEXIS 112335 (W.D. Mich. Dec. 3, 2009) (court applied heightened standard after just two months of discovery, explaining that parties "had an ample opportunity to obtain substantial information . . . [and] there [was] a sufficient evidentiary record to determine whether this action can be managed on a collective basis"); *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 509

(M.D. La. 2005) (heightened standard applied where case was pending for over a year); *Baroni v. BellSouth Telecommunications, Inc.*, 2004 U.S. Dist. LEXIS 14403 at *44-5 (E.D. La. July 27, 2004).

Plaintiffs' case law on this point is easily distinguishable.  In one case, this Court **rejected** the lenient standard and applied "heightened scrutiny" to a first-phase certification motion filed "[p]ost-discovery." *Torres v. Gristede's Op. Corp.*, 2006 U.S. Dist. LEXIS 74039 at *29 (S.D.N.Y. Sept. 28, 2006).  The Court applied the lenient standard in *Damassia v. Duane Reade, Inc.*, 2006 U.S. Dist. LEXIS 73090 (S.D.N.Y. Oct. 4, 2006), only because discovery was "in its early phases," the plaintiffs had not all been deposed and had no opportunity to depose witnesses, and the discovery deadline was more than three months away, facts indisputably absent here.  *Id.* *12.  In *Toure v. Cent. Parking Sys.*, 2007 U.S. Dist. LEXIS 74056 (S.D.N.Y. Sept. 28, 2007), the lenient standard was used because "[o]nly limited fact discovery was conducted . . . [and Defendants] resisted production of various materials."  *Id.* *8.  In the remaining cases Plaintiffs cite, the parties either did not dispute that the inception standard was applicable or agreed discovery was incomplete.  (*See* Pls. Br. 14-17).

Indeed, Plaintiffs' own brief belies the inconsistency of their position.  They do not even purport to rely on the "pleadings and affidavits" that typically comprise the entire evidentiary record at the *Lusardi* inception phase, but instead repeatedly cite (and mischaracterize) evidence disclosed during discovery in support of their motion.  Yet, because their newest proposed classes cannot survive scrutiny, Plaintiffs simultaneously ask the Court to ignore this same factual record to grant certification.  Such "heads I win, tails you lose" posturing is not contemplated under *Lusardi.*

Put simply, Plaintiffs are asking for a "do over."  After a year of comprehensive discovery, they still cannot identify a cohesive class that is even arguably proper for § 16(b) certification.  Accordingly, they ask the Court to send notices to over 19,500 people spread across all 50 states, just to allow them another bite of the discovery apple.  Such a result is inconsistent with § 16(b) and considerations of judicial efficiency.  *Basco v. Wal-Mart Stores, Inc.*, 2004 U.S. Dist. LEXIS 12441 at *26 (E.D. La. July 1, 2004) ("[I]t would be an exercise in gross mismanagement of judicial and litigant

17

time and money to certify the class as requested given the overwhelming evidence brought before the court").

### B.   Section 16(b) Certification Would Require Numerous, Unmanageable Mini-Trials Concerning Multiple FLSA Overtime Exemptions.

Plaintiffs must prove that they and proposed class members "together were victims of a common plan or policy that violated the law" by classifying them as exempt. *Castro, supra.* Exempt status depends on an employee's actual, "primary duty," defined as "the principal, main, major or most important duty that the employee performs . . . based on all the facts in a particular case." 29 C.F.R. § 541.700(a). An employee's primary duty can only be determined based on such individualized characteristics as "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*

Because of the fact-specific inquiry needed to determine exempt status, the plaintiff in a § 16(b) misclassification case cannot show a common, unlawful policy if class members perform dissimilar duties. *See Diaz v. Elec. Boutique*, 2005 U.S. Dist. LEXIS 30382 at *17 (W.D.N.Y. Oct. 13, 2005); *Young v. Cerner Corp.,* 503 F.Supp.2d 1226, 1231 (W.D. Mo. 2007) (certification denied where putative members' duties were "so varied that it is hard to conceive of a single policy that could govern them all"). Moreover, where proposed class members in such cases perform both exempt and nonexempt work, courts recognize that certification is improper due to the required individualized determination of each member's primary duty. This Court specifically rejected § 16(b) certification on this basis in *Amendola, supra.* After finding that some putative class members performed duties covered by the FLSA's outside sales exemption, the Court rejected § 16(b) certification as inconsistent with "the fair and expeditious resolution" of plaintiffs' claims. *Id.* at 475-77.

In this case, it is beyond genuine dispute that proposed class members performed at least some duties covered by one or more overtime exemptions. Numerous employees, including Plain-

tiffs Schwab, Brignola, Deluhery, Brousseau, and Ahlberg and employees who reported to EDS managers McIlroy (Ex. 54), McConnell (Ex. 53), and Kukla (Ex. 68), advised EDS customers on strategic IT matters, researched and recommended emerging IT trends and technologies, managed IT projects, worked as team leads coordinating the work of others, participated in approving and rejecting changes to customer IT environments, and were involved in countless other aspects of customers' computer networks, internet and database administration.  (*See* Ex. 42).[10]

The FLSA regulations *specifically* define such duties as falling within the **administrative exemption**.  *See* 29 C.F.R. § 541.201(b) ("Work directly related to management or general business operations includes, but is not limited to . . . computer network, internet and database administration"); 29 C.F.R. § 541.203(c) ("An employee who leads a team of other employees assigned to complete major projects for the employer . . . generally meets the duties requirements for the administrative exemption, even if the employee does not have direct supervisory responsibility over the other employees on the team"); 29 C.F.R. § 541.402 (administrative exemption covers computer employees "[if their primary duty includes work such as planning, scheduling, and coordinating activities required to develop systems to solve complex business, scientific or engineering problems of the employer or the employer's customers").

Consistent with these regulations, courts routinely hold that such IT services are administratively exempt, including a case involving **three EDS job codes** Plaintiffs seek to include in their proposed classes.  *Heffelfinger v. Elec. Data Sys. Corp.,* 580 F. Supp. 2d 933, 968 (C.D. Cal. 2008), appeal pending (employees in information specialist senior, information analyst, and systems administrator senior job codes all administratively exempt); *see also Booth v. Electronic Data Systems*, 799 F. Supp. 1086 (D. Kan. 1992) (data analysis); *Piscione v. Ernst & Young*, 171 F.3d 527, 536-37 (7th Cir. 1999) (assigning and reviewing work of other employees); *Bagwell v. Florida Broadband*, 385 F. Supp.

---

[10] Ex. 42 is a chart that organizes excerpts of cited deposition and declaration testimony for the Court's convenience.

2d 1316, 1320-21, 1326 (S.D. Fla. 2005) (identifying and solving network problems); *Koppinger v. Am. Interiors, Inc.*, 295 F. Supp. 2d 797, 799 (N.D. Ohio 2003) ("ordering replacement parts, recommending purchases of new software and hardware, installing software, and repairing equipment for the company's computer users").

Other exemptions also apply. Plaintiffs Deluhery, Brown, and Hightower and employees who reported to EDS managers Amthor (Ex. 61), Lawson (Ex. 52), and Kress (Ex. 67), designed, developed, modified and tested computer systems, networks and software applications based on consultations with customers regarding their unique business needs. They also analyzed computer systems and network functions to create solutions to problems and optimize functionality. They held numerous IT certifications reflecting their considerable expertise (*i.e.*, MCSEs, CCNAs, CCNPs, and CCDAs), and were subject matter experts on various applications and technologies. (*See* Ex. 42). These duties fall within the FLSA's **computer exemption**. In fact, Plaintiff Brown agreed that his duties required the ability to "design, develop, document, analyze, create, test or modify computer systems or programs related to user or system design specifications," and that he "modif[ied] computer programs related to the design of software or hardware for computer operating systems," a *verbatim* recitation of the computer exemption's language. (Ex. 16 at 231-32; *see also* 29 C.F.R. §§ 541.300-304, 541.400-402).

Judge McMahon considered many of these duties just weeks ago in *Clarke v. JPMorgan Chase Bank*, 2010 U.S. Dist. LEXIS 33264 (S.D.N.Y. March 26, 2010). Like several Plaintiffs in this case, the *Clarke* plaintiff managed capacity on the employer's computer systems, interacted with internal clients regarding their storage needs, identified issues associated with data migration to new servers, and conducted root cause analysis to determine the nature and cause of infrastructure problems. *Id.* *48-50. He held a CCNA certification and was a "subject matter expert" on the employer's printing infrastructure ( "NDPS"). *Id.* *16. Judge McMahon denied conditional certification and granted summary judgment on behalf of the employer, reasoning that, "if [plaintiff]--who, by his own admis-

sion, was the NDPS 'guru' and 'the go-to person for capacity management in the Northeast region'--does not qualify as [an exempt] computer employee, it is difficult to imagine who, other than, perhaps, a computer programmer, would." *Id.* *59-60; *see also Bobadilla v. MDRC*, 2005 U.S. Dist. LEXIS 18140 (S.D.N.Y. Aug. 23, 2005) (network administrator engaged in design, creation, testing and modification of computer systems was exempt computer employee).

Other members of the proposed class, such as Plaintiffs Brown, Geary, and Brignola and employees who reported to EDS managers Bintzler (Ex. 62), Smith (Ex. 74), and Disch (Ex. 80), are covered by the FLSA's **professional exemption**, which applies to "work requiring advanced knowledge in a field of science or learning customarily acquired through prolonged, specialized intellectual instruction, specialized academic training, or a combination of work experience and intellectual instruction." 29 C.F.R. § 541.301(a) and (d); *see also Galasso v. Eisman, Zucker, Klein & Ruttenberg*, 310 F. Supp. 2d 569, 575 (S.D.N.Y. 2004). "The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree." 29 U.S.C. § 541.300. As shown above, the work performed by proposed class members is advanced and complex and in many cases required college degrees and/or certifications that required study in various IT curricula. (Ex. 42). Clearly, an individualized review will be required to determine applicability of the professional exemption in these instances. *See also* 29 C.F.R. § 541.301(f) ("Accrediting and certifying organizations similar to those listed [in the regulations] . . . may develop similar specialized curriculums and certification programs which, if a standard requirement for a particular occupation, may indicate that the occupation has acquired the characteristics of a learned profession.")

Furthermore, a number of proposed class members, including Plaintiffs Brignola, Ahlberg, Brown, and Geary and employees who reported to EDS managers DiGiovine (Ex. 51), Kuhns (Ex. 59), and Donovan (Ex. 57), had authority to hire, fire, discipline, direct and promote employees. (*See* Ex. 42). Many more conducted performance evaluations, participated in hiring, and approved time off requests. (*Id.*). Indeed, Plaintiff Brignola described himself as "supervis[ing] four levels of

support staff," while Plaintiff Brown was "accountable for leading a team of 10 second level technical specialist[s]." (Ex. 3 at 123; Ex. 16 at 50-51, 176-77, 181-83, 187). Such duties are covered by the FLSA's **executive exemption**. *See* 29 C.F.R. § 541.100; *Golden v. Merrill Lynch & Co.*, 2007 U.S. Dist. LEXIS 90106 at *34 (S.D.NY. Dec. 6, 2007).[11]

Consistent with this Court's decision in *Amendola, supra,* numerous courts have held that putative § 16(b) class members cannot be similarly situated where their duties are covered by even *one* exemption. For example, the court reasoned that § 16(b) certification would not be "sensible" in *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220-21 (D. Conn. 2003), where putative class members performed both exempt and non-exempt tasks, and the dispute concerned which tasks were the employees' primary duty. The court in *Morisky* held that a "collective action would be anything but efficient . . . [where] [t]he exempt or non-exempt status of potentially hundreds of employees would need to be determined on a job-by-job, or more likely, an employee-by-employee basis." 111 F. Supp. 2d at 498-499. In *Evancho v. Sanofi-Aventis U.S. Inc.*, the court held that class members were not similarly situated because some were closely supervised while others had discretion to plan their workdays. 2007 U.S. Dist. LEXIS 93215 at *13 (D.N.J. Dec. 18, 2007).

Similarly, in *Reich v. Homier Distrib. Co.*, 362 F. Supp. 2d 1009 (N.D. Ind. 2005), the court denied § 16(b) certification, reasoning that to determine which putative class members were exempt would require a "highly individualized, fact-specific inquiry" as to the specific duties of each employ-

---

[11] Moreover, over 3,400 members of the three proposed classes received total annual compensation of over $100,000. (Ex. 33 ¶ 7). These individuals may be covered by the FLSA's exemption for **highly compensated employees** in addition to the exemptions described above. *See* 29 C.F.R. § 541.601 (2009) ("An employee with total annual compensation of at least $100,000 is deemed exempt under section 13(a)(1) of the Act if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee."). Obviously, the extent to which these employees "customarily and regularly perform" any exempt duties will necessitate yet another set of individual inquiries. Furthermore, this Court has recognized that an individual inquiry will be necessary to determine whether the FLSA's **air carrier exemption** applies to the two Cunningham Plaintiffs and the handful of other "Staff Augs" on EDS' American Airlines account by ordering that trial of this case will be bifurcated, with the first phase devoted to that issue. (DE 129, p. 20).

ee, how much time was spent each day on those duties, and which duties "required the exercise of discretion." *Id.* at 1013. Thus, "it will be impossible to come up with a class-wide determination on liability." *Id.*; *see also Aguirre v. SBC Communs., Inc.*, 2006 U.S. Dist. LEXIS 22211 at *20 (S.D. Tex. Apr. 11, 2006) (§ 16(b) certification denied because applying the executive exemption would require "a fact-specific and individualized inquiry into . . . the number of employees supervised; the ability to recommend hiring, firing, and reprimanding workers; the employee's opportunity to exercise discretion, and the amount of time the employee spends on nonmanagerial tasks."); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1271 (M.D. Ala. 2004) (same).

Plaintiffs' inability to demonstrate the appropriateness of certification in this case is even more pronounced. Undisputed evidence confirms that both Plaintiffs and absent proposed class members performed duties that not only varied significantly, but were also subject to the numerous exemptions discussed above. (*See* Ex. 42). Thus, this Court would be unable to issue a single liability determination for all members of the collective action, and would instead have to consider putative members' claims individually.

Unable to deny this dissimilarity, Plaintiffs simply retreat from the issue—*they make no showing whatsoever regarding the actual duties performed by absent class members.* As this Court has noted, however, a factual showing that pertains primarily to the named plaintiffs cannot support certification even under the lenient inception standard. *Levinson*, *supra* at *5 ("[A] demonstration of the similarity of circumstances of the existing plaintiffs is, of course, insufficient"); *see also Morales v. Plantworks, Inc.*, 2006 U.S. Dist. LEXIS 4267 at *7 (S.D.N.Y. Feb. 1, 2006); *Barfield*, *supra* at *3; *Hampshire, supra* at *13-15. Moreover, where named plaintiffs seek certification covering multiple locations, many courts require a *de facto* higher showing of personal knowledge in regard to absent class members' duties, a showing which Plaintiffs cannot make here. *See Castro*, *supra* at *5; *Eng-Hatcher v. Sprint Nextel Corp.*, S.D.N.Y. Case No. 07 Civ. 7350 (BSJ), Order Denying Motion for Cert. pp. 12-13 (Ex. 65); *Diaz*, *supra* at *17.

Plaintiffs also attempt to camouflage the differences in their own duties by characterizing them in imprecise, meaningless terms. For example, they describe members of both Proposed Classes A and B as "installing, maintaining, and/or supporting computer hardware and/or software." (Pls. Br. at 7, 9). Yet, by placing them in separate proposed classes, Plaintiffs demonstrate that their "install/maintain/support" mantra is meaningless in terms of describing exempt duties.

Even in the four footnotes where they make a minimal attempt to describe their actual duties, Plaintiffs fail to show they are similar. For example, Plaintiffs make the bold assertion that "all systems administrators performed the same key job roles: performed various tasks related to local networks and wireless networks, analyzing and troubleshooting connection issues." (Pls. Br. 8). Yet, such functions are never attributed to any members of the proposed class. Indeed, Plaintiff Brousseau (who held the system administrator job code) is described as performing duties that did "not [include] network design or support of wireless or campus-area networks." (*Id.* n. 7).

Plaintiffs further suggest that differences in actual duties are irrelevant at this stage, citing to *Damassia v. Duane Reade, Inc.*, 2006 U.S. Dist. LEXIS 73090 (S.D.N.Y. Oct. 4, 2006). *Damassia*, however, involved only two, very similar positions (day and night assistant store managers), in stark contrast to the thousands of different job roles at issue here. Moreover, the *Damassia* court criticized the defendant's evidence opposing certification not because it was irrelevant *per se*, but because it had "little if anything to do with whether plaintiffs are similarly situated 'with respect to their allegations that the law has been violated.'" *Id.* *19. In this case, the undisputed evidence EDS presents has ***everything*** to do with whether Plaintiffs are similarly situated in regard to the violation they allege; it establishes that the actual duties performed by putative class members fall within one or more of the FLSA's overtime exemptions, albeit in different ways. Accordingly, this evidence pertains directly to the very issue Plaintiffs challenge—whether EDS misclassified its employees as exempt.

Plaintiffs also claim that courts "liberally grant" § 16(b) certification in "information technology support" cases, regardless of evidence showing differences in duties. (Pls. Br. 15). They

make no mention, however, of the cases finding § 16(b) certification improper where IT employees' duties vary to the extent even remotely at issue in this case.  For example, in *Young, supra,* one of the plaintiffs wrote and configured computer code, provided input into functional design and engaged in testing and troubleshooting.  The other plaintiff was responsible for researching, analyzing and making recommendations for process changes and increasing efficiency.  Because these duties fell within different overtime exemptions, the Court concluded that "inclusion in the same class would require two separate inquiries by the Court to resolve the merits of their case . . . [and] it cannot be said that they are so similarly situated as to warrant certification as representatives of a single class." *Id.* 1231; *see also King v. West Corp.*, 2006 U.S. Dist. LEXIS 3926 at *43-45 (D. Neb. Jan. 13, 2006) (telecommunications employees serving multiple customers not similarly situated under § 16(b)).

Plaintiffs again rely on distinguishable case law for this point.  In *Malloy v. Richard Fleischman & Assocs.*, 2009 U.S. Dist. LEXIS 51790 (S.D.N.Y. June 3, 2009), Judge McMahon granted conditional certification of a class of only 250 employees who performed IT-related duties on a motion submitted just two months after the case was filed, when there had been "virtually no discovery." *Id.* *8.  This a far cry from this case, which has been pending for four years, encompasses 19,500 individuals, and in which certification discovery is complete by Plaintiffs' own admission.  Indeed, this case is much more like the very recent *Clarke* case discussed above, where Judge McMahon denied § 16(b) conditional certification based on evidence from discovery demonstrating that the plaintiff was covered by the computer employee exemption.

Plaintiffs also cite *Lewis v. Wells Fargo*, 669 F. Supp. 2d 1124 (N.D. Cal. 2009), which is inapposite.  The defendant in *Lewis* refused to provide job descriptions for more than 7 months after the court-imposed deadline, refused to schedule depositions for 14 months, and admitted to the court that discovery on the certification issue was not complete.  *Id.* 1128.  The plaintiffs also presented evidence specifically demonstrating that the actual duties of the putative collective action members (who did not support external customers) were similar, and the court granted conditional

certification on that basis.  *Id.*  By contrast, EDS never refused discovery and agreed to multiple discovery extensions.  Plaintiffs also have produced no evidence regarding actual duties of absent class members, and undisputed evidence shows absent class members performed widely dissimilar roles for hundreds of different customers, with vastly different IT needs.

Plaintiffs also ask the Court simply to ignore the issue of whether proposed class members performed duties covered by various FLSA exemptions, claiming that this issue should be considered only after §16(b) certification.  In support of this argument, Plaintiffs again cite to *Damassia* and other earlier decisions.  This Court recently rejected this proposition, however, in *Amendola, supra.* That opinion was based on the Second Circuit's admonition that district courts' "obligation to [decide Rule 23 class requirements] is not lessened by overlap between a Rule 23 requirement and a merits issue." *In re Initial Pub. Offering Sec. Litig.,* 471 F.3d 24, 41 (2d Cir. 2006).  Judge Cote held in *Amendola* that this reasoning applies with equal force in the § 16(b) context, explaining that she would "scrutinize the merits based on the record developed to date by the parties and to the extent necessary to address this motion for authorization of notice." *Amendola*, *supra* at 467 n. 9; *see also Clarke*, *supra* (§ 16(b) certification denied as moot where evidence showed plaintiff was exempt).

Moreover, consideration of whether the FLSA's overtime exemptions might apply to certain duties of putative class members is not equivalent to ***deciding*** the merits; it simply determines whether, at some point in the future, exemption issues will be uniform among class members and subject to generalized proof.  *See Evancho*, *supra* at *8-9 ("Potential collective action members . . . [are] not 'similarly situated' as to FLSA status when that status ***may*** differ depending on their job responsibilities" (emphasis added)); *Diaz v. Elec. Boutique, supra* at *17 ("[a]lthough [putative collective action members] share the same job description, their responsibilities, in fact, ***may*** differ . . . making class treatment inappropriate.") (emphasis added); *see also Young, supra* at 1231 (certification denied where "analysis of the merits of [plaintiffs'] claim, though not at issue at this early stage, would necessarily involve a review of her job description and responsibilities").

Courts recognize that ignoring the potential applicability of overtime exemptions at the certification phase is contrary to judicial efficiency.  In this regard, *Johnson v. Big Lots Stores* serves as a cautionary tale for courts faced with the question of conditionally certifying a large collective action class (in that case, 1,200 employees) where there is evidence that class members perform dissimilar duties.  561 F. Supp. 2d 567, 587-8 (E.D. La. 2008) ("The Court regrets that it must decertify this action [after a full trial on the merits], after the large investment of resources by the parties"); *see also, e.g., Basco, supra* at \*26; *Freeman*, 256 F. Supp. 2d at 945 ("It would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated").

The risk of such an outcome is starkly apparent in this case, where it is indisputable that the putative class members perform at least ***some*** duties covered by at least one of the FLSA's overtime exemptions.  Granting Plaintiffs' request for certification would require the Court to revisit the certification issue based on a record that already exists, but only after the expenditure of considerable resources by the Court and the parties.  Because this result is unquestionably inconsistent with the judicial efficiency considerations underlying § 16(b), certification should be denied.

### C.     Plaintiffs Fail To Make A Factual Showing Of A Common Unlawful Plan Or Policy Subject To Generalized Proof.

Section 16(b) requires Plaintiffs to show that all class members' overtime claims are subject to generalized proof based on a "common policy or plan that violated the law."  *Castro, supra.*  Plaintiffs, however, fail to identify a particular EDS policy or practice that resulted in all 19,500 proposed class members being misclassified as exempt.  Indeed, it is difficult to imagine any common proof that could determine the misclassification claims of Plaintiff Fugitt, who claims he performed nothing more than low-level network support at an auto plant, and the EDS employee who traveled internationally for the CDC conducting seminars concerning tuberculosis containment and uses of computer technology in epidemic prevention.  (*See infra* at pp. 6-8.)  It is equally inconceivable how Plaintiff Goldberg, whom EDS voluntarily reclassified based on information she provided that she

performed mere desktop relocations, could be similarly situated *vis-à-vis* the FLSA's exemptions to proposed class member Dean McGeachy, who oversaw EDS teams responsible for designing project plans to assimilate new business into EDS' IT environment, or to Plaintiff Confar, who worked from his home enhancing customers' telecommunications capabilities. (*Id.* at pp. 3-6). Undisputed evidence (including Plaintiffs' own testimony) describes numerous additional examples of such dissimilarities among the proposed classes, even within the same job codes. (*Compare* Ex. 3, Ex. 9, Ex. 15; *compare* Ex. 4, Ex. 11; *compare* Ex. 2, 17). Yet, Plaintiffs ask the Court to include these individuals in the same classes and try their claims together without even a wisp of a suggestion of common proof. [12]

Plaintiffs appear to rely exclusively on the simple fact that EDS used employee job titles and descriptions, claiming that EDS "groups employees who perform similar work into job families and, within each job family, into jobs or job codes." (Pls. Br. 4). EDS witness Mike Evans repeatedly insisted, however, that while EDS ***intended*** for employees in the same job code to perform similar functions at a very general level, "that [was] not typically the reality." (Ex. 20 at 32-33; *see also id.* 35-36, 38, 41, 46-47, 61, 77, 84, 91-92, 180-81). Common job classifications are insufficient to support § 16(b) certification in such circumstances. *See, e.g. Diaz v. Elec. Boutique, supra* at *17 ("[a]lthough

---

[12] Plaintiffs' claim that EDS willfully misclassified employees in the proposed classes further underscores their lack of common proof. For instance, during 2006-7, EDS conducted a voluntary internal audit under the supervision of the U.S. Department of Labor to determine whether certain employees were properly classified as exempt. During this process, Plaintiffs Deluhery (Class A) and Hernandez (Class B) both affirmed they performed exempt duties exercising discretion and independent judgment, resulting in their continued classification as exempt employees. (Ex. 6, 28-29; Ex. 38 pp. 2, 4-5; Ex. 8, 114-16, 178-79, Ex. 35, p. 4; Ex. 45 ¶ 12). Plaintiffs Goldberg and Brousseau, however, were ***voluntarily*** reclassified into nonexempt positions and offered back overtime based on their descriptions of their duties. (Ex. 4, 77-79, Ex. 36, p. 4; Ex. 11, 29, 80-87 ; Ex. 37; Ex. 45 ¶ 15). In addition, hundreds of proposed class members (including Brousseau) signed DOL-sanctioned WH-58 releases after being paid and reclassified. (Ex. 45 ¶ 16). Dozens of other proposed class members (including Plaintiff Char) were reclassified and offered back overtime based on information EDS learned during various voluntary, internal investigations. (*Id.* ¶ 21). Obviously, the extent to which EDS acted in good faith in reclassifying and paying back overtime to these employees (and in relying on information provided by employees such as Deluhery and Hernandez in *not* reclassifying them) will necessitate further individualized inquiries into the particular circumstances of each such decision.

[putative collective action members] share the same job description, their responsibilities, in fact, may differ . . . making class treatment inappropriate") *King v. West Corp., supra* at *43 ("[E]mployees with the same job title are not 'similarly situated' for the purposes of an 'opt-in' FLSA class if their day-to-day job duties vary substantially"); *Forney v. TTX Co., supra* at *8 ("Whether similarly situated employees exist depends on the employees' actual qualifications and day to day duties, rather than their job descriptions."); *Young, supra* at 1231; *Pfohl v. Farmers Ins. Group,* 2004 U.S. Dist. LEXIS 6447 at *21 (C.D. Cal. March 1, 2004); *Pfaahler v. Consultants for Architects,* 2000 U.S. Dist. LEXIS 1772 (N.D. Ill. Feb. 8, 2000); *see also Vinole v. Countrywide Home Loans, Inc.,* 246 F.R.D. 637 (S.D. Cal. 2007), *aff'd* 571 F.3d 935 (9th Cir. 2009) (common job classifications not a proper basis for Rule 23 class certification absent evidence they are a reliable indicator of actual duties).

Moreover, Plaintiffs focus throughout their Brief on the purported similarity among individuals in the same EDS job codes. The job codes, however, are not the basis for Plaintiffs' proposed classes. Rather, Plaintiffs group together several broad "job families," combining **multiple** job codes into each proposed class (*i.e.,* nine job codes in Class A, seven job codes in Class B, and four job codes in Class C). They offer no evidence that proposed class members all perform similar duties, and ignore Evans' specific testimony that employees in a job family **did not** perform "a similar type of work." (Ex. 20 at 60-61). Thus, aside from the other flaws in their position, Plaintiffs' assertions regarding EDS job codes are inconsistent with their class definitions.

Finally, Plaintiffs' reliance on EDS job codes for class certification also is incompatible with the merits of their claims. As the *Heffelfinger* court recognized in awarding summary judgment to EDS, the duties listed in EDS' job code descriptions in three of the job codes included in Plaintiffs' proposed classes are indisputably exempt. 580 F. Supp. 2d at 943 n.60, 968. Indeed, a side-by-side comparison of the descriptions for the 20 job codes Plaintiffs include in their three proposed classes shows that they describe duties defined by applicable regulations as exempt. *Compare* Ex. 43 (job descriptions) with 29 C.F.R. §§ 541.100-541.402). Stated simply, proposed class members were **not**

misclassified if they performed the duties listed in their job code descriptions.  Thus, to the extent Plaintiffs argue that the Court should ignore the overwhelming evidence of wide variations in proposed class members' actual job duties and focus instead on their written job descriptions, there would be no ***unlawful*** plan or policy common to the proposed class.

## IV.   CONCLUSION

Plaintiffs simply cannot show that there is a common plan or policy that caused all 19,500 employees they seek to represent to be misclassified as exempt and that this case can proceed based on generalized proof, without the need for individualized inquiry.  Therefore, § 16(b) certification and notice must be denied. [13]

Dated:  May 7, 2010                             Respectfully submitted,

                                                BAKER & HOSTETLER LLP


                                                By:  *Martin T. Wymer*
                                                     Martin T. Wymer
                                                     Todd A. Dawson
                                                     Michelle B. Anselmo
                                                     PNC Center
                                                     1900 East Ninth Street
                                                     Suite 3200
                                                     Cleveland, OH  44114-3482

                                                     *Attorneys for Defendant*
                                                     *Electronic Data Systems Corporation*

---

[13] Plaintiffs' proposed notice improperly requires disclosure of data far beyond names and addresses of putative class members (including Social Security numbers), does not explain discovery obligations, directs employees to contact Plaintiffs' counsel rather than a third-party administrator, provides for an inordinately long opt-in period, and contains a needlessly presumptuous anti-retaliation clause.  *See Bah v. Shoe Mania, Inc.*, 2009 U.S. Dist. LEXIS 40803 (S.D.N.Y. May 13, 2009); *see also Lewis v. Wells Fargo & Co.*, 669 F. Supp. 2d 1124 (N.D. Cal. 2009).  While there are additional flaws in Plaintiffs' proposed notice, EDS requests that the Court allow the parties to address this issue, if necessary, following the Court's decision on certification.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on May 7, 2010, a true and correct copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

*Martin T. Wymer*
Martin T. Wymer
